# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PIONEER VALLEY CASKET CO INC, et al,   §
                                        §
          Plaintiffs,                   §
VS.                                     §     CIVIL ACTION NO. H-05-3399
                                        §
SERVICE CORPORATION                     §
INTERNATIONAL, et al,                   §
                                        §
          Defendants.                   §

## ORDER DENYING CLASS CERTIFICATION

Pending before the Court are the plaintiffs' objections to the magistrate judge's Memorandum and Recommendation on class certification. *See* Docket No. 205. The plaintiffs challenge certain findings and recommendations in the Memorandum and Recommendation entered by the magistrate judge on November 24, 2008, recommending that the motion for class certification be denied. *See* Docket No. 209. The defendants have filed a response to the plaintiffs' objections. *See* Docket No. 213.

The Court has reviewed the plaintiffs' objections, the defendants' responses to the plaintiffs' objections, and the Memorandum and Recommendation, and has made a *de novo* review of the specified findings or recommendations to which objection is made and has otherwise reviewed the Memorandum for plain error. *See* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b) advisory committee's note (1983); *Douglass v. United States Auto. Ass'n,* 79 F.3d 1415, 1420 (5th Cir. 1996) (en banc) (unobjected-to proposed factual findings and legal conclusions accepted by the district court

reviewed for "plain error").  The Court finds that the Memorandum and Recommendation should be adopted as this Court's Memorandum and Order.  It is, therefore,

ORDERED that the plaintiff's objections to the magistrate judge's Memorandum and Recommendation are DENIED.  It is further

ORDERED that the Memorandum and Recommendation is ADOPTED as the Court's Memorandum and Order.  Finally, it is

ORDERED that the plaintiffs' motion for class certification and the plaintiffs' supplemental motion for class certification (Docket Nos. 70 and 71) are DENIED.

SIGNED and ENTERED this 26th day of March, 2009.

Kenneth M. Hoyt
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| PIONEER VALLEY CASKET COMPANY, INC., *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| *versus* | § § | CIVIL ACTION NO. H-05-3399 |
| SERVICE CORPORATION INTERNATIONAL, *et al.*, | § § § | |
| *Defendants.* | § § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Plaintiffs' Motion for Class Certification. The Court held a class certification hearing December 4-8, 2006. Thereafter, the parties submitted post-hearing briefs. After careful consideration, the Court RECOMMENDS that Plaintiffs' Motion for Class Certification and Plaintiffs' Supplemental Motion for Class Certification (Docket Entry Nos. 70 and 71) be DENIED.

## I. *Background*

### A. *Procedural*

This is an antitrust case brought by an alleged class of independent casket distributors ("ICDs"),[1] including Plaintiffs Pioneer Valley Casket Co., Inc. ("Pioneer"), Eternal Comfort d/b/a The Casket Store ("Eternal Comfort"), Finality L.L.C. ("Finality"), and Funeral Supplies, Inc. d/b/a The Casket Store ("Funeral Supplies") (collectively "Plaintiffs"), and others similarly situated, against Defendants Service Corporation International ("SCI"), Alderwoods Group, Inc.

---

[1] "ICD," as defined by Plaintiffs, refers to third party sellers of caskets who are unaffiliated with any of the Funeral Home Defendants. *See* Docket Entry No. 26, at ¶ 1.

("Alderwoods"), Stewart Enterprises, Inc. ("Stewart") (collectively the "Funeral Home Defendants"),

Batesville Casket Company ("Batesville"), and Hillenbrand Industries, Inc. ("Hillenbrand")

("Defendants").  *See* Docket Entry No. 26.  Plaintiffs seek to enjoin alleged anticompetitive

agreements to foreclose ICDs from the nationwide retail market and to recover lost profits that

Plaintiffs alleged they would have made but for their alleged inability to purchase Batesville caskets,

as well as alleged "disparagement" and "sham discounting."  *See* Docket Entry No. 26, at ¶¶ 2-5,

180-187.  In their First Amended Consolidated Class Action Complaint, Plaintiffs assert claims

against Defendants under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief

for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under Section 4

of the Clayton Act, 15 U.S.C. § 15, and to recover the costs of suit, including attorneys' fees.  *See*

*id.*, at ¶ 6.  Specifically, Plaintiffs assert that Defendants conspired to eliminate and/or hinder the

possibility of ICDs from selling, at discounted prices, certain caskets, including but not limited to,

caskets manufactured by Batesville, York Group, Inc. ("York"), and Aurora Casket Company York

("Aurora").[2]  *See id.*, at ¶ 180.

The parties have filed and the Court has considered many dispositive and non-dispositive

motions. Notably, the Court denied Defendants' motions to dismiss.  *See* Docket Entry Nos. 72, 84.

The parties engaged in full discovery and have had ample opportunity to brief the issues surrounding

---

[2] The factual allegations and legal theories articulated in Plaintiffs' Amended Complaint are nearly identical to those filed by the Funeral Consumer Alliance ("FCA") in H-05-cv-3394.  The material difference between the two cases is that in the present case the plaintiffs purport to represent casket stores; however, in the FCA case, Plaintiffs purportedly represent consumers.

class certification, both before and after the class certification hearing.  The question now before the

Court is whether class certification is proper under Federal Rule of Civil Procedure 23.[3]

**B.**     *__Factual__*

**1.**     *__Funeral Industry__*

Retail providers of caskets include funeral homes as well as ICDs.  ICDs are comprised of

various types of casket retailers, including brick-and-mortar storefronts devoted to casket sales,

casket businesses operated by individuals out of their homes, Internet sellers devoted to caskets,

Internet retailers that sell caskets as one of many products (*e.g.*, Amazon.com), specialty casket

retailers that focus on unique market niches (*e.g.*, themed, artisan), and at least one "big box" retailer

that sells caskets as just one of many products. (*e.g.*, Costco).  *See* Docket Entry No. 93, at Exhs A,

T, and CC.

Batesville is the largest United States manufacturer of caskets, accounting for approximately

44% of caskets sales in the United States in 2004.[4]  *See* Docket Entry No. 71, at Exhs. A, B.

Batesville offers for sale a wide range of caskets, including metal, wood, and cloth-covered caskets.

*See id.*  For over 100 years, Batesville has sold its caskets only to licensed funeral homes operated

---

[3]  Plaintiffs seek to certify a class defined as follows:
   All independent casket distributors in the United States who are presently in business or were in
business any time from July 8, 2001, to the present, including a subclass of independent casket distributors
who paid a surcharge in order to obtain a Batesville casket from an entity other than Defendant Batesville.
Excluded from the class are independent casket distributors that:
      (1) are affiliated in any way with any funeral home;
      (2) manufacture and/or distribute specialty caskets; and/or
      (3) Defendants and all directors/officers, agents, employees, parents, subsidiaries, affiliates, and/or
co-conspirators of Defendants and all governmental entities. *See* Plaintiffs' Reply Memorandum, filed Nov.
21, 2006, at p. 2.

[4]  Batesville is a wholly-owned subsidiary of Hillenbrand. *See* Docket Entry No. 71, Appx., Expert Report
of R. Craig Romaine, at ¶ 14.

by licensed funeral directors. *See* Docket Entry No. 93, at p. 8, n.3. Batesville has never changed this policy. Batesville maintains a casket distribution system, which it describes as a national high-velocity, hub and spoke distribution system, consisting of 6 rapid deployment centers and 86 customer service centers in North America. *See* Docket Entry No. 71, Appx., Expert Report of R. Craig Romaine, at ¶ 14. Because of its size, Batesville has warehouse and distribution facilities that enable it to sell nationwide and deliver a casket to a funeral home within a day or two after it is ordered. *See* Docket Entry No. 71, Appx., Aff. of Gary L. French, at ¶ 12.

The next two largest United States casket manufacturers are York and Aurora. *See* Docket Entry No. 93, Exh. T, at ¶¶ 30-31. Like Batesville, York and Aurora have distribution facilities that enable them to sell nationwide and deliver a casket to a funeral home within a day or two. *See* Docket Entry No. 71, Appx., Aff. of Gary L. French, at ¶ 12. Additionally, there are a number of smaller manufacturers and distributors of caskets in the United States that accounted for approximately 29% of all U.S. casket sales in 2004. *See* Docket Entry No. 93, Exh. T, at ¶ 33. Finally, ICDs account for roughly 2% of casket sales in the United States. *See id.*, at Exh. DD. Approximately eight states mandate that caskets can be sold only through licensed funeral homes, so ICDs cannot operate legally in those states. *See id.*, at pp. 10-11, n.16.

Batesville does not restrict its funeral home customers from re-selling its caskets to other retail entities. Thus, many ICDs obtain Batesville caskets from funeral homes or "jobbers," who also obtain them from funeral homes, and re-sell them to consumers. *See* Docket Entry No. 93, at p. 11, n. 17.

4

2.    ***Proposed*** **Class Representative**

Four putative class representatives and their owners have been identified. Each proposed class representative has had very different experiences.

a.    **Funeral Supplies, Inc. d/b/a The Casket Store ("Funeral Supplies")/Bob White**

Bob White ("White"), the owner of Funeral Supplies, was the only named plaintiff that made a profit. Before White started his casket store, he had 25 years of experience owning and operating several profitable restaurants. *See* Docket Entry No. 93, at p. 11, n.21. White's initial investment of $40,000 was the largest of the named plaintiffs, his monthly rent of $1,000 was the lowest, and he spent the most on advertising, *i.e.*, $20,000 a year, primarily television in the Macon, Georgia market. *See id.*, at pp. 11-12, nn.22-25. In Macon, there was only one other casket store that competed with White. *See id.*, n.25. White obtained caskets from several manufacturers and distributors, including caskets by the container load from China, paying half the cost of what he payed for Batesville caskets; which, in turn, provided him with larger profit margins. *See id.*, nn.27-28. White obtained Batesville caskets from local funeral homes when customers requested them. *See id.*, n.30.

b.    **Eternal Comfort d/b/a The Casket Store ("Eternal Comfort")/Victor Lovick**

Unlike White, prior to opening Eternal Comfort, Victor Lovick ("Lovick") lacked small business experience. *See* Docket Entry No. 93, at p. 12, n.31. Lovick's initial investment of $15,000 and advertising expenditures of $750 were well below the estimated need of $50,000 and $1,500, respectively. *See id.* at pp. 12-13, nn.32-35. Lovick purchased caskets from a number of sources, including Batesville caskets from local funeral homes. *See id.*, n.33. Lovick operated in the

Atlanta, Georgia market where he faced stiff competition from other casket stores. *See id.* at p. 13, n.37.

Within his first year of business, due to expenses, Lovick had abandoned all television advertising, taken down his billboard, lost rights to a favorable website domain name and changed to a less memorable domain name, experienced difficulty turning over timely the sales tax that he collected, and engaged in a dispute with the state over unemployment tax owed. *See* Docket Entry No. 93, at p. 13, nn.36, 38-40. When Lovick closed his store, he continued to operated an ICD business out of his home, using a Batesville catalog from which customers selected the caskets they desired. Lovick obtained the Batesville caskets from a local funeral director. *See id.*, nn.41-43. According to Lovick's deposition testimony, the profit margin on the Batesville caskets he sold was virtually the same as the profit margin on the other caskets he sold, inclusive of any surcharge or delivery costs paid. *See id.*, n.45.

### c.   Finality LLC ("Finality")/Stephanie Webb

Stephanie Webb ("Webb") had never started a small business before opening Finality. Webb's initial investment was $36,000; her monthly rent of $2,000 was the highest of the named plaintiffs; she spent $5,500 on advertising during her first year, but cut it thereafter, spending less that $100 per quarter. *See* Docket Entry No. 93, at p. 14, nn.46-48. Webb, as well as her employees, used her store to conduct other business activities, including acting as an investment advisor, selling cemetery plots, and serving as a receiver for a cemetery. *See id.*, nn.50, 52. Webb used only one source for caskets and never attempted to purchase Batesville caskets. *See id.*, n.53. Finality was located in North Little Rock, Arkansas. *See id.*, n.49.

6

**d.**     **Pioneer Valley Casket Co., Inc. ("Pioneer Valley")/Phillip Wartel**

Phillip Wartel ("Wartel") had little prior experience running a business prior to opening

Pioneer. *See* Docket Entry No. 93, at p. 14, nn.54. Wartel's initial investment in Pioneer was

$15,000; his rent was $1,550; and, at first, he spent $1,500 on advertising before cutting back due

to expenses. No customers requested a Batesville casket from Wartel and Wartel never attempted

to purchase Batesville caskets from funeral homes; instead, he purchased caskets on consignment

from a single supplier. *See id.*, at pp. 14-15, nn.57-59. Wartel's target market was in the Pioneer

Valley in Western Massachusetts. *See id.*, at p. 14, n.56. Pioneer eventually went out of business.

**III.     *Standard for Class Certification***

The requirements for certifying and maintaining the class action at issue in this case are set

forth in FED. R. CIV. P. 23(a), (b)(2), and (b)(3):

(a)     **Prerequisites.** One or more members of a class may sue or be sued as
representative parties on behalf of all members only if:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the
claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the
interests of the class.

(b)     **Types of Class Actions.** A class action may be maintained if Rule 23(a) is
satisfied and if:

\* \* \*

(2)     the party opposing the class has acted or refused to act on grounds
that apply generally to the class, so that final injunctive relief or

7

> corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3)    the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

"A district court must rigorously analyze Rule 23's prerequisites before certifying a class." *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 310 (5th Cir. 2000). This requires an understanding of "the relevant claims, defenses, facts, and substantive law presented in the case." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998). The Fifth Circuit directs courts considering whether class certification is appropriate, to consider each claim for relief separately, taking into account the class to be certified, the relief sought, and the claim brought. *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 (5th Cir. 2000). A district court "must give full and independent weight to each Rule 23 requirement, regardless of whether that requirement overlaps with the merits." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007). Ultimately, the court must consider "how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp.*, 339 F.3d at 302 (internal citations omitted). A rigorous analysis of the substantive law is designed to ensure that the class-wide trial does not "degenerate into a series of individual trials." *See id.* (internal citations omitted).

Courts are given wide discretion in deciding certification issues. *See Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 478 (5th Cir. 2001). As long as the court considers, and makes findings relative to, the requirements of Rule 23(a) and (b), a district court's decision regarding certification is afforded considerable deference. *See Vizena*, 360 F.3d at 502-03. The party seeking certification "bears the burden of

8

demonstrating that the requirements of Rule 23 have been met." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003); *see also Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

## IV.    *Rule 23 Analysis*

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *See Maldonado v. Ochsner Clinic Foun.*, 493 F.3d 521, 523 (5th Cir. 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997)); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003); *Vizena*, 360 F.3d at 502-03. The relevant factors will be examined as follows.

### A.    *Rule 23(a)*

Rule 23(a) requires four prerequisites to a class action:  (1) the class be so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). *See* FED. R. CIV. P. 23(a); *see also Amchem Prods., Inc.*, 521 U.S. at 613-14. The Rule 23(a) requirements will be discussed separately below.

#### 1.    *Numerosity*

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." *See* FED. R. CIV. P. 23(a)(1). Plaintiffs contend that there are approximately 250-300 ICDs in the United States with locations in 17 states. *See* Docket Entry No. 71, at Exhs. M, N. Given their number and geographic dispersion, Plaintiffs argue that joinder of all such ICDs would

be impracticable.  Defendants do not dispute that Plaintiffs have met the numerosity requirement.[5]
*See* Docket Entry No. 93, at pp. 40-47.  As such, Rule 23(a)(1) is satisfied.

### 2. *Commonality*

Rule 23(a)(2) provides that the district court may certify a class if "there are questions of law
or fact common to the class."  *See* FED. R. CIV. P. 23(a)(2).  The commonality requirement is met
"where there is at least one issue, the resolution of which will affect all or a significant number of
the putative class members."  *See Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir.
1997); *see also Mullen*, 186 F.3d at 625; *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.
1993).  The threshold  for commonality is not demanding; a single common question of law, such
as Defendants' alleged violation of a federal statute, establishes commonality.  *See, e.g., Lightbourn*,
118 F.3d at 426.

Here, Plaintiffs allege a single conspiracy among Defendants (*i.e.*, the largest players in the
funeral industry) and their co-conspirators to foreclose ICDs as a whole from the market for burial
caskets by denying them access to the dominant brand of casket, the Batesville brand, and by
refusing ICDs access to Defendant Batesville's national distribution network.  *See* Docket Entry No.
71, at pp. 14-15.  Plaintiffs allege that all the members of the class have an interest in any proof of
a conspiracy or concerted action with the aim or restraining trade in the funeral industry by refusing
to deal with or to boycott ICDs.  *See id.*, at p. 15.  Because the issue of whether Defendants violated
the Sherman Act affects all potential class members, Plaintiffs share a common legal theory.  *See*

---

[5] Defendants maintain that Plaintiffs' proposed class is neither adequately defined nor clearly ascertainable.
*See* Docket Entry Nol. 93, at pp. 38–40.  Defendants assert that Plaintiffs' inclusion of "unidentified co-
conspirators" is ambiguous.  *See id.*, at p. 30.  The Court, however, agrees with Plaintiffs that by excluding
entities affiliated with funeral homes, the proposed class meets the ascertainability requirement.

*James v. City of Dallas*, 254 F.3d 552, 570 (5th Cir. 2001). The Court finds that the Rule 23(a) threshold for commonality is low and that Plaintiffs have met this requirement.

### 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." *See* FED. R. CIV. P. 23(a)(3). The typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426. Plaintiffs contend that the gravamen of their antitrust claim is Defendants' conspiracy to destroy competition from ICDs. *See* Docket Entry No. 71, at p. 16. Thus, Plaintiffs argue that all ICDs were injured as a result of Defendants' collective scheme, as evidenced by their lost profits on sales they would have made absent Defendants' wrongdoing and lost profits due to reduced profit margins on sales actually made. *See id.* "Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625; *see also James*, 254 F.3d at 571.

Notwithstanding, Defendants argue, and the Court agrees, that Plaintiffs have not made the required showing of typicality. *See* Docket Entry No. 93, at pp. 40-41. Specifically, each Plaintiff cannot show that it was foreclosed from obtaining Batesville caskets. Indeed, there is no "typical" plaintiff, as some ICDs obtained Batesville caskets; some did not want Batesville caskets; and some wanted Batesville caskets but did not obtain them. Consequently, the named Plaintiffs cannot demonstrate that their claims arise from the same legal theory as the claims of the claims of absent class members. Thus, based on these differences, Plaintiffs have not established the typicality requirement of Rule 23(a)(3) and class certification is inappropriate.

11

### 4.   *Adequacy*

Under Rule 23(a)(4), the court must find that the "representative parties will fairly and adequately protect the interests of the class." *See* FED. R. CIV. P. 23(a)(4). "Rule 23(a)(4)'s adequate representation requirement is comprised of essentially two parts-one relating to the class representatives and the other to the class counsel: (1) the counsel must be qualified and experienced, and (2) the representatives must not have antagonistic interests with class members." *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 421-22 (S.D. Tex. 1999). Defendants do not dispute that Plaintiffs' counsel is adequate. Indeed, the Court finds that Plaintiffs' counsel have significant experience in complex litigation; hence, they are qualified and experienced. Counsel for Plaintiffs have vigorously prosecuted this case from its inception.

Instead, Defendants argue, and this Court agrees, that an intra-class conflict exists. *See* Docket Entry No. 93, at pp. 42-48. Defendants contend that because this is a competitor class action where the plaintiffs seek to recover lost profits for sales not made, there are inherent conflicts in the proposed class. *See id.*, at pp. 44-45. As acknowledged by the parties' respective experts, it is undisputed that, due to increased competition from cremation, the relevant markets in this action are limited. *See id.*, at p. 44, nn.131-132. Even assuming, *arguendo*, that the relevant market were nationwide, as Plaintiffs contend, all ICDs would be competing in the same markets for the same sales. The limited profits available from such limited markets, creates an intra-class conflict.

Defendants also contend that differences between named Plaintiffs that are small casket retailers and absent class members that are large corporate retailers who sell caskets (*i.e.*, Costco) will create conflicts between the named Plaintiffs' and the class members' interests. *See* Docket Entry No. 93, at pp. 45-48. Indeed, Costco has a single casket supplier (Universal Casket), and there

is no evidence that Costco has been hindered by any inability to obtain Batesville caskets. Costco secures a low-cost source of supply and attempts to move volume at a low cost. Due to its size, Costco has the ability to spread its overhead over a large number of products and has access to a far greater amount of capital that most other ICDs, giving it a significant advantage over traditional casket stores.

Moreover, there is no evidence that Costco or other large market participants (*e.g.*, Amazon.com) have been impacted by any alleged inability to obtain Batesville caskets. The Court gives little weight to the opinions of Plaintiffs' expert economist, Gary L. French, Ph.D. ("Dr. French") as he fails to consider the interests of ICDs that are large retailers or how their inclusion in the class will affect Plaintiffs' ability to prove fact of damage or amount of damage on a class-wide basis. *See* Docket Entry No. 93, at p. 47, nn.138-139. For example, Dr. French has not indicated what portion of "but-for" market share in the alleged national market would have been attributable to sales by Costco or other large retailers.

There is absolutely no basis to assume that a large retailer like Costco would have lost profits in the an amount similar to those lost by an ICD like Pioneer Valley, which sold only 54 caskets the entire time it was in business. *See id.*, n.140. Remarkably, Dr. French appears to assume as much, proposing to calculate lost profits by estimating actual casket sales and lost sales based on a survey or sample data, and using an "average" ICD profit margin, an exercise that would be meaningless in predicting the likely relative success of Costco and Pioneer Valley in the "but-for" world. Finally, if larger retailers' were not injured by their inability to obtain Batesville caskets, as the facts demonstrate here, their casket sales should not be included in the Plaintiffs' "but-for" world. For these reasons, the named Plaintiffs' interests conflict with those of larger retailers. *See In re Milk*

13

*Prods. Antitrust Litig.*, 195 F.3d 430, 436-37 (8th Cir. 1999) (affirming denial of certification where the named plaintiff suffered from many "adequacy deficiencies," including the fact that it was a small convenience store owner whose interests conflicted with the large grocery stores in the class); *Bradburn Parent/Teacher Store, Inc. v. 3M*, No. Civ. A 02-7676, 2004 WL 414047, at *9 (E.D. Pa. Mar. 1, 2004) (denying class certification on the ground that the named plaintiff, a small retailer, could not adequately represent the interest of large volume retailers in the class); *see also San Antonio Tel. Co., Inc. v. AT&T Co.*, 68 F.R.D. 435, 440-41 & n.1 (W.D. Tex. 1975) (noting that the "corporate giants in the class "probably did not need protection").

In sum, the named Plaintiffs cannot adequately represent the class due to inherent conflicts in the proposed class. Hence, it cannot be certified under Rule 23(a)(4).[6]

## B. *Rule 23(b)(3)—Predominance & Superiority*

The additional requirements set forth in Rule 23(b)(3) need be discussed only after the Plaintiffs have satisfied the class action prerequisites set forth in Rule 23(a). *See* FED. R. CIV. P. 23(b)(3). Notwithstanding the Court's conclusion that Plaintiffs have not met their burden to establish each of the four Rule 23(a) prerequisites, for purposes of a complete record, the Court will address the Rule 23 (b) requirements.

There are no "hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment." *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 316 (5th Cir. 1978). Rather, "[t]he unique facts of each case will generally be the determining factor governing certification." *Id.* For class actions seeking money damages, as here, the court must make additional

---

[6] Even assuming, *arguendo*, that Plaintiffs could meet the typicality and adequacy requirements of Rule 23(a)(3) and Rule 23(a)(4), class certification still would not be warranted because Plaintiffs cannot meet the more demanding requirements of Rule 23(b)(3) and/or Rule 23(b)(2).

findings of predominance and superiority. *See Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (citing FED. R. CIV. P. 23(b)(3)). Rule 23(b)(3) requires a party seeking class certification to demonstrate both "(1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy." *Bell Atl. Corp.*, 339 F.3d at 301; *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 600 (5th Cir. 2006). Courts refer to these two requirements respectively as the "predominance" and "superiority" criteria. *See id.*

"[T]he predominance and superiority requirements are far more demanding than is Rule 23(a)(2)'s commonality requirement." *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004) (internal citations omitted). The predominance inquiry requires courts "to consider how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp.*, 339 F.3d at 301-02. To establish predominance, the court must compare the issues common among the class members and the issues individual to them. *See Castano*, 84 F.3d at 745. The superiority analysis "requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *Allison*, 151 F.3d at 419.

### 1. *Plaintiffs Cannot Prove Their Claims with Class-Wide Proof*

In their Amended Complaint, Plaintiffs allege one cause of action against Defendants, *i.e.*, a group boycott conspiracy in violation of Section 1 of the Sherman Act, to eliminate and/or hinder the possibility of ICDs from selling, at discounted prices, certain caskets, including but not limited to, Batesville, York, and/or Aurora caskets. *See* Docket Entry No. 26, at ¶¶ 178-187. According to Plaintiffs, Defendants implemented their group boycott conspiracy by certain conduct, including restricting casket distribution, disparaging ICDs, as well as utilizing "sham discounting." *See id.*

15

"To prevail on a Section 1 claim, plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Stewart Glass & Mirror, Inc. v. United States Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 312 (5th Cir. 2000) (internal citations omitted). Plaintiffs' task, however, is not limited to establishing the elements of a completed offense under the Sherman Act. *See Bell Atl. Corp.*, 339 F.3d at 302. Rather, "[p]rivate antitrust liability . . . requires the showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage." *Robinson*, 387 F.3d at 422. The fact of damage or "impact" element under Rule 23(b)(3) (also known as "antitrust injury") requires Plaintiffs to put forth common proof that the antitrust violation caused the injury to the antitrust Plaintiff. *See Blue Bird Body Co., Inc.*, 573 F.2d at 317. It is "a question unique to each particular plaintiff and one that must be proved with certainty." *See id.* at 327. Additionally, it, too, requires proof of the relevant market.

a.      ***Plaintiffs Cannot Prove Their Alleged Conspiracy on a Class-Wide Basis***

Market definition is a critical part of Plaintiffs' burden in the class certification process. Where local or regional markets exist, plaintiffs must prove a conspiracy and an effect on competition in each market and the issue of conspiracy cannot predominate. *See Blue Bird Body Co., Inc.*, 573 F.2d at 321-22 (denying class certification because common issues did not predominate where plaintiffs had to prove conspiracy on a state-by-state basis, rather than a nationwide basis). Here, Plaintiffs' attempt to certify a nationwide class of ICDs is dependent on their allegation that there is a single, nationwide market for the sale of caskets. Plaintiffs, however, have failed to offer any proof of the geographic scope of the market. Instead, Dr. French merely *assumed* a nationwide market for caskets without conducting an actual inquiry into the scope of the

16

relevant market. *See* Docket Entry No. 93, at p. 35, n.113. This falls short of Plaintiffs' burden of defining the relevant market in which the conduct complained of has an adverse effect on competition. *See George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998).

Contrary to Plaintiffs' contention, the evidence in this case clearly demonstrates that the relevant markets for analyzing Defendants' conduct are the local and regional markets for funeral goods and services across the United States. Each of the named Plaintiffs testified that they each had a local or regional target market in which they sought to compete: (1) Pioneer Valley's target market was within a 50-mile radius of Northampton, Massachusetts: (2) Funeral Supplies had a target market within a 35-mile radius of the store itself in the area of Macon, Georgia; (3) Finality had a target market of Arkansas, and the surrounding states of Texas, Kentucky, Mississippi, and Louisiana; and (4) the majority of Eternal Comfort's business was local, in the greater Atlanta, Georgia area. *See* Docket Entry No. 93, at pp. 36-37, nn.114-118. Moreover, the named Plaintiffs' casket sales further demonstrate the inherently local nature of the market for caskets. For example, Pioneer Valley made only two sales in Connecticut despite the fact that the business was only 22-23 miles from the Connecticut line and Hartford, Connecticut was by far the largest city in his 50-mile target market. *See id.*, at n.119. In fact, Pioneer Valley delivered only 4 caskets outside of Western Massachusetts during its operation. *See id.*, at n. 120. Similarly, although Finality targeted Arkansas and its surrounding states, it delivered only two caskets out of state, and the majority of its sales were limited to the greater Little Rock area. *See id.*, at n.121. Likewise, Funeral Supplies delivered only 2 caskets to consumers out of state, and Eternal Comfort produced evidence of only 3 caskets sold out of state. *See id.*, at nn.122-123.

17

At the hearing, Defendants' expert economist, David S. Sibley, Ph.D. ("Dr. Sibley"), testified that the correct geographic market is not nationwide. As explained in his report, casket prices vary widely from locality to locality, as do numerous other factors, demonstrating that markets are local. Other factors supporting Dr. Sibley's opinion include the following: his testimony that most consumers shop for caskets locally; ICDs rarely shipped their products out of state; ICDs generally sold and advertised locally; and ICDs did not consider internet prices in setting their own prices. Although it is true that some Internet sellers may offer casket delivery over wider regions, this does not transform a local market into a national one. Consumer surveys taken in 1999 and 2004 reveal that only a small number of consumers shopped on the internet for funeral pricing information, much less to actually purchase a casket. Consequently, the existence of Internet sellers does not alter the fact that caskets are bought and sold in local competitive conditions.

The Court finds Dr. Sibley's opinions to be well-reasoned and supported by concise reliable testimony as to why the correct geographic market is localized and not nationwide as well as why each claim is not susceptible to class-wide proof. Dr. Sibley supported his testimony with references to analytical data and other specialized work which he has performed as an economist. In contrast, Dr. French's opinions were based on his assumption of a nationwide market, causing his reports to lack foundation. Consequently, the Court gives less weight to Dr. French's opinions.

Because there are numerous local and regional markets throughout the United States, common issues do not predominate with respect to the alleged conspiracy. *See Blue Bird Body Co., Inc.*, 573 F.2d at 323. Plaintiffs have not met their burden of establishing a nationwide geographic market.

**b.**   *Failure to Prove Fact of Damage ("Impact") on Class-Wide Basis*

Fact of damage, otherwise known as impact or injury, requires plaintiffs to demonstrate that the alleged antitrust violation was the cause of injury to the plaintiffs. *See Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982). Plaintiffs must establish fact of damage as to each class member:

> Establishing causation, or 'fact of damage,' requires the plaintiff to demonstrate a causal connection between the specific antitrust violation at issue and an injury to business or property of the antitrust plaintiff. This requirement is in no way lessened by reason of being raised in the context of a class action. . . . Accordingly, we have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.

*Bell Atl. Corp.*, 339 F.3d at 302 (internal citations omitted); *see also Blue Bird Body Co., Inc.*, 573 F.2d at 327.

In a concerted refusal to deal case in which plaintiffs seek lost profits, fact of damage is particularly difficult to prove. "The *sine qua non* of the injury caused by a refusal to deal [is] inability to obtain the product. From this failure to obtain the product would flow subsidiary consequences: loss of sales or market share . . . ." *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 792 (5th Cir. 1983). Fact of damage may not be presumed in a lost profits case where other factors, separate and apart from the alleged anticompetitive conduct, influence sales and profits. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126-129 (1969). In sum, where antitrust plaintiffs seek to recover lost profits, individualized analysis as to fact of damage is required and class certification is inappropriate. *See, e.g., Shumate & Co., Inc. v. National Ass'n of Secs. Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir.), *cert. denied*, 423 U.S. 868 (1975).

Here, Dr. French, proposes a method of proving fact of damage by using a "survey of a sample of ICDs exploring specific instances of reduced profits or lost casket sales attributable to

Defendants' conduct." *See* Docket Entry No. 71, at p. 36. This method is fundamentally flawed because a survey of only a sample of ICDs cannot prove fact of damage to every class member. Moreover, as explained below, some members of the proposed class have suffered no impact. As such, it is not possible to show common proof of impact as to every class member is not possible, which, in turn, defeats class certification.

        (i).      ***Individualized Inquiry Required to Determine Whether Any Plaintiff Lost Profits as a Result of the Alleged Conduct***

In this case, the impact of the alleged violation is a function of a myriad of variables, including: the effect of Batesville's policy on an individual ICD; the competitive environment in which an individual ICD operates; an individual ICD owner's prior experience in operating a business; the initial capital investment and ability to fund necessary expenses until the business is established; the scope and costs of advertising, which in turn are dependent on the market in which the ICD operates; the level of fixed overhead costs and labor costs, if any; and the other businesses in which the ICD engages. *See* Docket Entry No. 93, at p. 19, n.62. Among the proposed class members in this case, each of these factors varied widely.

The testimony of the proposed class representatives demonstrates the individualized nature in which they allegedly were impacted by Batesville's policy. With respect to Pioneer Valley, not a single customer asked for a Batesville casket while it was in operation. *See* Docket Entry No. 93, at pp. 19-20, n.63. Thus, the owner, Wartel, testified that he never made any effort to obtain Batesville caskets from a funeral home or jobber, a route other casket stores routinely used to obtain Batesville caskets. *See id.*, at p. 20, n.64. Because Pioneer Valley had cash flow problems soon after opening, Wartel negotiated a consignment arrangement with his casket supplier, Casket Royale, that enabled him to take caskets for his showroom and pay for them only after he sold them. *See id.*, at

n.65. Thus, Wartel was not in a financial position to receive caskets from any supplier other than Casket Royale. Finality's owner, Webb, testified that customers occasionally asked her for Batesville caskets, but she never investigated purchasing Batesville caskets from any source other than Batesville. *See id.*, at n.66. The owners of Eternal Comfort and Funeral Supplies sought out and readily obtained Batesville caskets from local funeral homes when requested by customers. *See id.*, at n.67. When Lovick began operating Eternal Comfort out of his home, he offered only Batesville caskets. *See id.*, at n.68.

Additionally, some ICDs have business models that are inconsistent with offering Batesville caskets. For example, specialty casket retailers offer unique caskets (*e.g.*, handcrafted, artisan, themed, or eco-friendly) that they would not want to be associated with a large manufacturer such as Batesville. *See* Docket Entry No. 93, at pp. 20-21, n.68. Other ICDs, like Costco, have their own low-cost suppliers and would not want to compromise their costs structure for a more expensive brand.

Moreover, as set forth above, the competitive environment in which each ICD operates is very different. For example, the market in Atlanta, Georgia was described by Lovick as a "dog eat dog" environment. *See* Docket Entry No. 93, at p. 21, n.71. Owners White and Wartel testified that they faced less direct ICD competition in their respective local markets of Macon, Georgia and Western Massachusetts. *See id.*, at n.72. The level of competition affects ICDs' ability to make a profit. As explained by Dr. Sibley, "[c]asket stores located in areas experiencing intense competition from other casket stores and local funeral homes will tend to have lower profit margins than those casket stores located in areas with fewer rivals." *See id.*, at n.73 (Sibley Report, ¶ 132, Exh. T).

Other individualized factors that impact an ICD's profitability, include an ICD owner's prior experience operating a business. Prior to opening Eternal Comfort, Lovick had no small business

experience. *See* Docket Entry No. 93, at pp. 21-22, n.74. Thus, Lovick encountered difficulties managing his business affairs, including turning over sales tax collected in a timely manner, handling a dispute with the state over unemployment tax owed, and losing a favorable website domain name to another individual because Lovick failed to pay renewal fees. *See id.*, at p. 22, nn.75-77. Like Lovick, the owners of Finality and Pioneer Valley did not have experience operating a business, and were not profitable. In contrast, White, the owner of Funeral Supplies, had twenty-five years of small business experience and was profitable. *See id.*, at n.78. Prior experience operating a small business provides an ICD owner guidance in making important decisions (*e.g.*, choosing a store location, deciding on the initial amount of capitalization, creating a competitive price plan). *See id.*, at n.79.

The amount of start up capital as well as funds allocated for advertising can dramatically impact the profitability of an ICD. For example, the named class representatives' initial capital investments ranged from $15,000 to $40,000, with Wartel ultimately investing $140,000 in Pioneer Valley. *See* Docket Entry No. 93, at p. 22, n.81; *see also id.*, at p. 11, n.22. Similarly, advertising varied greatly by individual ICDs in both scope and costs. For example, on behalf of Finality, Webb spent $5,500 on advertising during her first year of operation, but cut it thereafter, spending less than $100 per quarter. *See id.*, at p. 23 n.83. Whereas White, the owner of Funeral Supplies, spent over $20,000 a year on advertising. *Se id.*, at n.84. Lovick testified that television advertising in Atlanta was substantially more expensive than in Macon. *See id.*, at n.82.

Finally, the level of overhead costs varies by ICD, as well. The proposed class representatives' rent ranged from $750 to $2,000 per month. *See* Docket Entry No. 93, at p. 23, n.85. Some ICDs own vans or other delivery vehicles. *See id.*, at n.87. Other ICDs use contractors. *See id.* Some ICDs have employees, while others do not. *See id.*, at n.88. An individualized inquiry is

necessarily required to determine the impact that these as well as other factors had on profitability on each proposed class member.

                **(ii).**      ***Individualized Inquiry Required to Disaggregate Lost Profits***

In a lost profits case, as here, Plaintiffs must conform to the "disaggregation rule." *See Infusion Res., Inc. v. Minimed, inc.*, 351 F.3d 688, 695-96 (5th Cir. 2003). Namely, Plaintiffs have a duty to disaggregate lost profits allegedly resulting from the conduct alleged in the complaint from lost profits caused by other factors. In this case, Plaintiffs cannot disaggregate lost profits for every class member through the use of common proof. Indeed, although Dr. French admits that "a variety of factors outside of defendants' actions affect the profitability of ICDs," he fails to explain how his proposed measure of damages will isolate the effects of Defendants' alleged conduct from other factors. *See* Docket Entry No. 93, at p. 25, n.89.

Dr. French proposes to determine a total percentage market share for caskets sold by ICDs and apply it to nationwide casket sales. Next, Dr. French proposes to subtract "actual" ICD casket sales to arrive at a volume of lost casket sales. Then, Dr. French proposes to apply an average ICD profit margin to the lost sales. *See id.*, at n.90. This method fails for a variety of reasons. As an initial matter, Dr. French assumes without any basis that there is a nationwide market for caskets, which, as set forth above, is inaccurate. Furthermore, Dr. French assumes that the difference between what Plaintiffs' sales would have been but for the Defendants' alleged conduct and what the Plaintiffs' actual sales were is the amount of the Plaintiffs' lost profits. This methodology must be rejected because it makes no attempt to account for the many other factors affecting profit margins, such as pro-competitive price cutting, that impacts each ICD differently. *See El Aguila Food Prods, Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 624-626 (S.D. Tex. 2003), *aff'd*, 131 Fed.

Appx. 450 (5th Cir. 2005) (excluding expert testimony on damages where the proposed damage model failed to disaggregate the effects of lawful competition).   Legitimate competition is encouraged by the antitrust laws and provides no basis for liability.  Here the task of separating the pro-competitive from the illegal, the independent from the conspiratorial, and the acts that injured a casket store from those that did not, it something that cannot be performed on a class-wide basis.

Plaintiffs also fail to disaggregate the effect of Batesville's original sales policy, which was adopted by Batesville unilaterally several years ago, and the effect of the alleged amendments to that policy, which plaintiffs claim were adopted as a result of a conspiracy among Defendants.  In order to disaggregate the undisputed lawful Batesville policy from the alleged unlawful amendments, Plaintiffs would have to propose a methodology that measure only the damage caused by the incremental increase in the difficulty and cost of obtaining Batesville caskets after the alleged amendments were enacted.  This issue is not addressed in Plaintiffs' proposed damage model.

Because Plaintiffs fail to disaggregate lost profits caused by factors other than the Defendants' alleged conduct, Plaintiffs' proposed damages methodology fails to prove fact of damage on a class-wide basis.  Thus, common issues as to fact of damage do not predominate and class certification is precluded.

(iii).   ***Individualized Inquiry Required to Determine Whether Any Plaintiff Was Injured by Alleged Disparagement or Sham Discounting***

Within their assertion of group boycott, Plaintiffs also allege Defendants disparaged ICDs and engaged in sham discounting. Only in the most extreme circumstances can disparagement form the basis for an antitrust claim; it is assumed to have a *de minimis* impact on competition. A *de minimis* impact is presumed because "(1) it is generally quite difficult to distinguish mere puffery from patently false statements relied upon by a consumer; (2) the effects of disparagement are

24

speculative at best, especially when disparagement is not systematic; and (3) most consumers view statements about a competitor cynically, recognizing the inherent bias and lack of objectivity of such statements." *David L. Aldridge Co. v. Microsoft Corp.,* 995 F. Supp. 728, 749 (S.D. Tex. 1998).

Hence, courts have developed a "strenuous test" to rebut the presumption of only a *de minimis* effect. Plaintiffs must prove that the allegedly disparaging statements were: "(1) clearly fake, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of counter statement, explanation, or other neutralization effort or offset by plaintiffs." *David L. Aldridge Co.*, 995 F. Supp. at 749.

As a threshold matter, Plaintiffs fail to provide any evidence that any funeral home or person affiliated with one of the Defendants made any disparaging remark that affected them. *See* Docket Entry No. 93, at p. 27, n.95. Although Wartel testified about two instances of disparagement that occurred while he operated Pioneer Valley, in each case, the offending funeral home had no connection with Defendants. *See id.*, at nn.96-97. In fact, Wartel testified that most funeral directs acted professionally in their dealings with him, with some funeral homes complimenting the quality of his merchandise and referring customers to him on occasion. *See id.*, at n.98. This independent actions of independent actors cannot be attributed to a conspiracy among Defendants.

Additionally, Plaintiffs do not allege that the same statements were communicated to every putative class member; thus, proof of disparagement necessarily will be highly individualized and inherently unsuitable for class certification. Here, Plaintiffs' evidence is neither uniform in content nor in source; Plaintiffs' evidence is not common. As such, Plaintiffs' "disparagement" evidence is neither class-wide nor probative of conspiracy.

Likewise, Plaintiffs fail to demonstrate as part of their group boycott claim that Defendants conspired to coordinate prices through a conspiratorial pricing strategy they call "sham discounting." Plaintiffs, however, have not shown on a class-wide basis that Defendants artificially inflated service prices; that each Funeral Home Defendant had a policy requiring its customers to purchase a casket in order to qualify for a package discount; that the discount was large enough to offset the casket savings available from the ICD; that the discounted price rather than some other factor about the package caused the consumer to buy the casket from the Funeral Home Defendant; and that these "sham discounting" policies were implemented as a result of an agreement among all Funeral Home Defendants. Indeed, not all of the Funeral Home Defendants offer package pricing, and, even to the extent they do, it is not uniform. Moreover, to determine whether service prices were artificially inflated would require analysis of the service prices in the context of the local funeral services markets, which defeats predominance because the evidence of service pricing in one market will not be relevant in another.

Significantly, none of the named Plaintiffs could identify a sale lost as a result of a sham discount. Only Wartel testified about an incident in which a funeral director allegedly raised his service price when he realized the consumer would use a third party casket; however, the offending funeral home had no connection to any Funeral Home Defendant and there is no evidence that this conduct was the result of a conspiracy rather than an unethical, independent decision by an independent funeral home. *See* Docket Entry No. 93., at p. 30, nn.103-104. Finally, Plaintiffs fail to distinguish the effect of the alleged sham discounting from the effects of procompetitive discounting. In short, whether any class member lost any sales due to sham discounting is an individualized inquiry that does not lend itself to class-wide treatment.

.   **(iv).**   ***"Survey Methodology" Clearly Inadequate to Demonstrate Injury as to Each Proposed Class Member***

Plaintiffs propose to use a "survey of a sample of ICDs exploring specific instances of reduced profits or lost casket sales" attributable to Defendants' alleged conduct. *See* Docket Entry No. 71, at p. 36. A survey of only a sample of ICDs, however, cannot prove fact of damage as to every class member. Dr. French acknowledged in his deposition that he did not know if he would use the survey to identify someone who had been harmed. *See* Docket Entry No. 93, at p. 30, n.105. The survey methodology also would be undermined by the fact that not all ICDs were affected by the alleged group boycott, including disparagement and/or sham discounts. *See id.*, at n.106. Dr. French admitted that these issues require individualized inquiry. Consequently, common issues do not predominate with respect to fact of damage. Thus, class certification is improper. *See Bell Atl. Corp.*, 339 F.3d at 302; *Blue Bird Body Co., Inc.*, 573 F.2d at 327.

**2.**   ***Failure to Show that Damages can be Calculated on a Class-Wide Basis***

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must also show that damages for each class member can be calculated using a common formula that results in "a just and reasonable estimate of the damages of every class member." *Bell Atl. Corp.*, 339 F.3d at 304. Where, as here, a proposed class seeks to calculate damages by use of an average, the plaintiffs bear the burden of demonstrating the similarity to the class of the businesses from which the average is derived. *See id.*, at 306; *see also Eleven Line, Inc. v. North Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 n.17 (5th Cir. 2000). In the case at bar, Plaintiffs have not met their burden.

As set forth above, highly individualized issues prevent a formulaic calculation of damages. Given the vast differences between the ICDs in the proposed class and the wide variety of factors affecting each ICD's profit margin, Plaintiffs' proposed calculation of lost profits cannot adequately

approximate individual damages on a class-wide basis. Dr. French admitted that he had not tried to reasonably approximate any actual economic loss by an individual ICD. *See* Docket Entry No. 93, at p. 33, n.110. Instead, Dr. French only calculated damages in the aggregate and *assumed* that all ICDs lost profits as a result of the alleged conduct of Defendants in some amount approaching the average. *See id.*, at n.109.

Dr. French's proposed damages methodology cannot provide a viable method of proving damages on a class-wide basis. Separate mini-trials would be required to determine the damages, if any, suffered by each class member, taking into account the dissimilar nature of their businesses and the various factors affecting their profitability. Moreover, to the extent certain class members may have never been profitable also precludes Dr. French's generalized damages calculation. *See Eleven Line*, 213 F.3d at 208-09; *see also Bell Atl. Corp.*, 339 F.3d at 304; *El Aguila*, 301 F. Supp. 2d at 626. For example, two of the proposed class representatives never have been profitable, and another only broke even for a brief period in 2002. *See* Docket Entry No. 93, at p. 34, n.111. Hence, individualized inquiry would be necessary to determine how to measure their alleged damages, as well as which other class members were unprofitable and how to measure their alleged damages.

Under these circumstances, certification is improper. *See Bell Atl. Corp.*, 339 F.3d at 308 (holding that "class certification is not appropriate" because plaintiffs "failed to demonstrate that the calculation of individualized economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement"); *O'Sullivan*, 319 F.3d at 745 (holding that the district court abused its discretion in certifying class "[i]n light of the individual calculation of damages that is required"); *Allison*, 151 F.3d at 419 (holding that certification was inappropriate because "plaintiffs' claims for compensatory and punitive damages must therefore focus almost entirely on facts and issues specific to individuals rather than the class as a whole").

In sum, after carefully considering all the evidence submitted, the Court is of the opinion that the impact of Defendants' alleged antitrust violations cannot be shown on a class-wide basis with common proof. Instead, it is a highly individualized, fact-intensive inquiry that necessarily requires consideration of factors unique to each potential class member. Plaintiffs did not meet their burden of establishing the necessary elements of Rule 23(b)(3). Dr. French's conclusions fall short of actually establishing antitrust impact on a class-wide basis through common proof. As such, the individualized issues predominate over common questions in this case, including causation, injury, and damages, and preclude class certification.

C.   *Rule 23(b)(2)—Class Injunctive Relief*

Under Rule 23(b)(2), class certification is appropriate if the requirements of Rule 23(a) are satisfied and:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

FED. R. CIV. P. 23(b)(2). "To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way, and injunctive relief must predominate over monetary damage claims." *Maldonado*, 493 F.3d at 524 (citing *Bolin*, 231 F.3d at 975). Monetary relief predominates in class actions unless it is incidental to requested injunctive relief. *See Allison*, 151 F.3d at 415. Here, Plaintiffs failed to satisfy these standards.

According to Plaintiffs, their allegations that Defendants' policies, practices, and procedures are designed to eliminate ICDs from the marketplace and suppress their ability to obtain and sell Batesville caskets warrants Rule 23(b)(2) certification. Plaintiffs' further contend that they seek an injunction preventing the conspiracy from continuing and threatening the livelihood of all class members. *See* Docket Entry No. 71, at pp. 18-21.

29

Contrary to Plaintiffs' contentions, in this case, monetary relief is not incidental to requested injunctive relief; instead, monetary relief predominates. Monetary damages cannot be computed without taking into consideration each class members' circumstances, a process that would likely require multiple evidentiary hearings. *See Colindres v. Quietflex Mfg.*, 235 F.R.D. 347, 377 (S.D. Tex. 2006) ("The operational meaning of 'incidental' damages in this setting is that the computation of damages is mechanical, without the need for individual calculation."). Computing lost profits sought by Plaintiffs would be anything but mechanical, requiring many individual calculations, both as to the fact and the amount of damages, based upon individual circumstances of each particular class member. *See* Docket Entry No. 93, at pp. 49-50, n.144.

Additionally, because of the wide differences among class members, there is a potential for conflict among class members with regard to injunctive relief. Injunctive relief that benefits one class member (*e.g.*, a casket store) might harm another class member (*e.g.*, a pure Internet seller) or vice versa. Indeed, Dr. French was unable to explain how to draft an injunction that would benefit all class members. Under these circumstances, Rule 23(b)(2) certification is improper. *See Allison*, 151 F.3d at 416 (affirming district court's denial of class certification under 23(b)(2) where compensatory damages required "individualized proof of injury, including how each class member was personally affected" by the challenged conduct); *Velasquez v. Crown Life Ins. Co.*, Nos. Civ. A M-97-064, MDL 1096, 1999 WL 33305652, at *2 (S.D. Tex. Aug. 10, 1999) (denying class certification under Rule 23(b)(2) where the monetary "damages allegedly due members of the proposed class would have to be separately calculated" based on facts individual to members of the class and were therefore not incidental).

## V.   *Conclusion*

Plaintiffs have not satisfied the requirements of Rule 23.   Accordingly, it is

**RECOMMENDED** that Plaintiffs' Motion and Supplemental Motion for Class Certification

(Docket Entry Nos. 70 and 71) be **DENIED**.

The Clerk shall send copies of the Memorandum and Recommendation to the respective

parties.   The parties have ten (10) days from receipt to file specific, written objections to the

Memorandum and Recommendation. *See* FED. R. CIV. P. 72.   Absent plain error, the failure to file

objections bars an attack on the factual findings, as well as the legal conclusions, on appeal.

SIGNED at Houston, Texas on this the ⟨24th⟩ day of November, 2008.

CALVIN BOTLEY
United States Magistrate Judge

31

# Exhibit 2

1    UNITED STATES DISTRICT COURT FOR THE

2   NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3    ---oOo---

4   STACIE SOMERS, on behalf of herself
    and all others similarly situated,        COPY

5
         Plaintiff,

6
    vs.                              No. CV 076507JW

7
    APPLE, INC., a California

8   corporation,

9

10       Defendants.

11   _____/

12

13

14              VIDEOTAPED

15         DEPOSITION OF STACIE SOMERS

16

17

18

19

20     Taken before EARLY K. LANGLEY, RMR

21          CSR No. 3537

22         June 17, 2008

23

24                    One Kaiser Plaza, Suite 505
                      Oakland, California 94612
25      AikenWelch        Ph  510-451-1580
        COURT REPORTERS   Fax 510-451-3797
                      www.aikenwelch.com

6

1  identify themselves and for whom they are

2  appearing.

3      MR. BRISKIN:  Craig Briskin of the firm

4  Mehri & Skalet representing plaintiff.

5      MS. ROACH:  Paula Roach from Coughlin        10:37

6  Stoia, and I represent Tucker, plaintiff.

7      MR. MITTELSTAEDT:  And Bob Mittelstaedt

8  and Michael Scott from Jones Day for the

9  Defendant.

10     THE VIDEOGRAPHER:  Would the counsel      10:37

11 please state any stipulation or statement they

12 would like on the record at this time.

13     MR. MITTELSTAEDT:  There are none.

14     THE VIDEOGRAPHER:  The court reporter may

15 now swear the witness.                          10:37

16              STACIE SOMERS,

17           sworn as a witness,

18           testified as follows:

19 EXAMINATION BY MR. MITTELSTAEDT:

20    Q.  Would you state your name and address,   10:37

21 please?

22    A.  Sure.  Stacie Somers.  And I live at 1551

23 Felspar Street, San Diego, California 92109.

24    Q.  Have you been through this process before

25 with the deposition?                            10:38

8

1    Q.  When did you graduate?

2    A.  In 1997.

3    Q.  And then what did you do?

4    A.  And then I worked for a year on Capitol

5  Hill for a senator and then I went to law school.   10:39

6    Q.  At Harvard?

7    A.  At Harvard, yes.

8    Q.  And when did you graduate from Harvard Law

9  School?

10   A.  2001.                                            10:39

11   Q.  What did you do then job-wise?

12   A.  I clerked for a judge in the Southern

13  District of California.

14   Q.  Who was that?

15   A.  Marilyn Huff.                                    10:39

16   Q.  And then what?

17   A.  And then I went to work at the law firm

18  formerly known as Milberg Weiss.

19   Q.  In San Diego?

20   A.  In San Diego, yes.                               10:39

21   Q.  When did you start with Milberg Weiss?

22   A.  I started in the fall of 2002, as I

23  recall.

24   Q.  Did you have a summer clerk position when

25  you were at Harvard law with any firm?              10:40

Aiken & Welch Court Reporters  Stacie Somers  6/17/08

9

1      A.  Yes.

2      Q.  At what firm?

3      A.  Heller Ehrman here in San Francisco.

4      Q.  And that would have been the summer of

5  2003?  No?                                      10:40

6      A.  No.  2000.  I'm trying to work backwards.

7      Q.  Yeah.  If you graduated in 2001 --

8      A.  2001.  Yeah.  So I believe summer of 2000.

9      Q.  And how long did you work at Milberg

10  Weiss?                                          10:40

11      A.  Approximately a year and a half.

12      Q.  What kind of work did you do during that

13  period?

14      A.  Plaintiff's class action work.  I worked

15  primarily in our consumer group doing false     10:40

16  advertising cases.  I also worked on one

17  anti-trust lawsuit.

18      Q.  Which case was that?

19      A.  I don't remember the name.  It was a case

20  about gas stations.  And I believe it was in     10:41

21  Florida, but I don't remember.  It wasn't a big

22  case.

23      Q.  Were you counsel of record in that case?

24      A.  My name might have been on some pleadings.

25  But I don't remember.                            10:41

36

1    seemed like a turbulent time that -- that -- I

2    didn't know what was going to be around later, and

3    more people I knew had iPods and I knew where you

4    could get the music online for -- for iPods.

5        Q.  So, one reason you bought the iPod is you    11:16

6    knew you could get music online from Apple's music

7    store?

8        A.  Yes.

9        Q.  But your main purpose in buying the iPod

10   at that time was to put your CD collection onto    11:16

11   it?

12       A.  Yes.

13       Q.  Thinking back on it at the time, did you

14   give some thought to whether there were

15   competitors who made MP3 players, or were you just    11:16

16   happy with Apple based on what you had heard from

17   your friends and so you didn't give it any

18   thought?

19       MR. BRISKIN:  Objection.  Misrepresents

20   testimony.    11:16

21       THE WITNESS:  I -- I gave it some thought

22   in that I probably thought, oh, there are other

23   music players.  I didn't really know how music

24   players worked.  And I wasn't sure how hard or

25   easy it was going to be.  I already knew someone    11:17

Aiken & Welch Court Reporters   Stacie Somers   6/17/08

37

1    who had an iPod who could help me.

2         So I guess I did give some thought to

3    competitors.

4    BY MR. MITTELSTAEDT:

5         Q.  So you thought at the time that there were   11:17

6    probably other choices you had, other competitors;

7    right?

8         A.  I thought --

9              MR. BRISKIN:  Objection.  Misstates prior

10   testimony.                                          11:17

11             THE WITNESS:  I thought -- can you repeat

12   that?

13   BY MR. MITTELSTAEDT:

14        Q.  Yeah.  At the time you bought this -- the

15   iPod you kept for yourself, did you believe that   11:17

16   there were other competitive choices if you had

17   wanted to go with a brand other than Apple?

18        A.  I believed that there were other music,

19   that someone had made other music players.  I

20   didn't know who specifically.                      11:18

21        Q.  And when you were at Target, you didn't

22   look around to see if there were other MP3

23   players; is that right?

24        A.  I had already decided to purchase the

25   iPod.                                              11:18

Aiken & Welch Court Reporters  Stacie Somers  6/17/08

38

1    Q.  Part of the reason you decided to purchase

2    the iPod was you were -- you had heard from Heidi

3    that it was easy to use?

4    A.  Yes.

5    Q.  When you bought the first iPod for Heidi,    11:18

6    did you feel that you had been forced or coerced

7    in any way to buy that for her?

8        MR. BRISKIN:  Objection.  To the extent it

9    calls for a legal conclusion.

10        THE WITNESS:  I do not believe anyone    11:18

11   forced or coerced me to buy the iPod for Heidi.

12   BY MR. MITTELSTAEDT:

13   Q.  When you bought the iPod that you kept for

14   yourself, did you feel that you were forced or

15   coerced in any way to buy that iPod?    11:19

16        MR. BRISKIN:  Same objection.

17        THE WITNESS:  I chose to purchase the

18   iPod.

19   BY MR. MITTELSTAEDT:

20   Q.  Did you feel that you were forced or    11:19

21   coerced to do it in any way?

22        MR. BRISKIN:  Same objection.

23        THE WITNESS:  No.

24   BY MR. MITTELSTAEDT:

25   Q.  If you had wanted to, you could have    11:19

43

1      A.  Thank you.  I'm not great with dates.

2      Q.  What model did you buy her?

3      A.  The same as mine.

4      Q.  And how did you decide to buy that for

5  your mother?                                        11:24

6      A.  I knew what it was.  I could show her how

7  to use it.  It was more memory, but it wasn't the

8  highest-priced one.

9      Q.  Did you have any understanding of what

10  sources of music she was going to use?              11:24

11      A.  My understanding was that she would upload

12  the music from a very large CD collection that she

13  has.

14      Q.  Did you feel forced or coerced in any way

15  to buy the iPod for your mother?                    11:24

16      MR. BRISKIN:  Objection to the extent it

17  calls for a legal conclusion.

18      THE WITNESS:  I don't -- no.  I don't

19  believe anyone forced me or coerced me to purchase

20  it.                                                 11:25

21  BY MR. MITTELSTAEDT:

22      Q.  How do you like your iPod?

23      A.  I like it.

24      Q.  What do you like about it?

25      A.  I like that I can have a large amount of    11:25

Aiken & Welch Court Reporters  Stacie Somers  6/17/08

1    Q.  So if you really wanted to get a competing

2  MP3 player rather than an iPod, at some point, it

3  would be worth your time to burn and rip the music

4  to a CD; right?

5    A.  I --                                          13:37

6        MR. BRISKIN:  Objection.  Compound.

7  BY MR. MITTELSTAEDT:

8    Q.  At some point.

9    A.  At some point, if I -- it would probably

10  depend on how badly I wanted the other thing.  I     13:38

11  mean certain variables, but I'm sure there would

12  be a point at some point.  I'm not sure when that

13  is.

14    Q.  So it would depend in part on whether

15  there was a competing MP3 player that you wanted     13:38

16  more than an iPod.  That would be one thing it

17  would depend on?

18        MR. BRISKIN:  Objection.  Misstates prior

19  testimony.

20        THE WITNESS:  It would depend on a number    13:38

21  of things, one being what player I wanted to play

22  on, yes.

23  BY MR. MITTELSTAEDT:

24    Q.  And how much you wanted -- how much you

25  preferred the other player over the iPod?           13:38

1    A.   That would be one part of the equation.

2    Q.   And another part of the equation would be

3  how long it would to take to transfer this music;

4  correct?

5    A.   That would be another part of the                    13:39

6  equation, probably, yes.

7    Q.   And what I wanted to do is just focus in

8  on that part of the equation.

9    A.   Okay.

10   Q.   And if you could burn and rip all of this   13:39

11  music that you bought from Apple in, say, 30

12  minutes, would you then go ahead and feel free to

13  buy the competing MP3 player rather than an iPod?

14   A.   I don't know.

15   Q.   Let's say it only took 12 minutes to burn   13:39

16  all of this.

17   A.   I don't know, because I don't think that I

18  can isolate the time from the other parts of what

19  my decision would be.

20   Q.   Is there a competing MP3 player that you    13:39

21  would prefer over the iPod if today you could

22  transfer this music in ten minutes?

23   A.   I don't know.

24   Q.   And that's because you haven't shopped

25  around for other i- -- for competitors to iPods;   13:40

Aiken & Welch Court Reporters  Stacie Somers  6/17/08

122

1      Q.  Can you estimate that, you know, for every
2  time you bought music you probably went to the
3  site five times without buying music, something
4  like that?
5      A.  My estimate would be more like for every      14:02
6  time I bought I went on once or twice.  There were
7  times I would look for podcasts more, I guess,
8  than music necessarily.
9      Q.  The majority of the files you downloaded
10  from Apple were podcasts, right?                      14:02
11      A.  I think so.
12      Q.  Do you have any of information about
13  whether those podcasts will play on competing MP3
14  players?
15      A.  I have no idea.                               14:02
16      Q.  So, another reason that if something
17  happens to your iPod you might get a replacement
18  iPod rather than a competing MP3 player is because
19  of all the podcasts you have in your library; is
20  that right?
21      A.  I don't know.  I hadn't thought about that
22  really.
23      Q.  But that's one of the factors you would
24  have to take into account is the ease of
25  transferring the podcasts?                           14:03

Aiken & Welch Court Reporters  Stacie Somers  6/17/08

159

1   STATE OF CALIFORNIA      )

2                            )        ss.

3   COUNTY OF ALAMEDA        )

4

5

6          I, EARLY LANGLEY, a Shorthand Reporter, State

7   of California, do hereby certify:

8          That STACIE SOMERS, in the foregoing deposition

9   named, was present and by me sworn as a witness in the

10   above-entitled action at the time and place therein

11   specified;

12          That said deposition was taken before me at

13   said time and place, and was taken down in shorthand by

14   me, a Certified Shorthand Reporter of the State of

15   California, and was thereafter transcribed into

16   typewriting, and that the foregoing transcript

17   constitutes a full, true and correct report of said

18   deposition and of the proceedings that took place;

19   IN WITNESS WHEREOF, I have hereunder subscribed my hand

20   this 6th day of July 2008.

21

22                    _____

23                    EARLY LANGLEY, CSR NO. 5793
                       State of California

24

25

Aiken & Welch Court Reporters

# Exhibit 3

Yahoo! Mail - staciesomers@yahoo.com

 **MAIL** Classic

Print - Close Window

**To:** "Stacie Somers" <staciesomers@yahoo.com>

**Subject:** Order Dispatched (Order No:297503) 02/22/2005 06:46:pm MST

**From:** "Ebuyer Customer Services" <orders@ebuyer.com>

**Date:** Wed, 23 Feb 2005 01:46:32 +0000 (GMT)


Hello Stacie Somers,

Thank you for ordering from Ebuyer.com. Your order has shipped ! A
complete recap of your shipment
is included below. Please review
and save for your records.·

The following item(s) have shipped:

1 x Apple iPod Mini 4GB MP3 Player - Silver - New/Retail


Once again, thank you for your order. We look forward to helping you
with all your needs in the
future.


Regards,


EBuyer.com


Please Note


· Do not be concerned if items in your order arrive in seperate
packages. For quicker delivery, we
ship from multiple warehouses throughout
the country.
· If there are more items in your order that have not yet shipped, we
will send you a confirmation
email as soon as they do.

To view your order  please click or copy/paste this link into your web
browser:
http://www.ebuyer.com/sw.html?soid=297503&_LOC=US

To track your order click or copy/paste the link into your browser:
http://www.ebuyer.com/customer/help/index.html?action=c2nvd3RyYWNrX29yZGVy&_LOC=US

Note that carrier tracking information may not be available until the
following business day.

Yahoo! Mail - staciesomers@yahoo.com

Page 1 of 2

# YAHOO! MAIL
Classic

Print - Close Window

**To:**       "Stacie Somers" <staciesomers@yahoo.com>

**Subject:**  Order Acknowledgement (Order No:297503)

**From:**     "Ebuyer Customer Services" <orders@ebuyer.com>

**Date:**     Tue, 22 Feb 2005 02:26:59 +0000 (GMT)


Dear Stacie Somers

Thank you for ordering with Ebuyer.com online !

Your order has been received and we have forwarded it for final
processing. Please save this email
for future reference.

Your order number is: 297503

You have ordered the following items:


Item: Apple iPod Mini 4GB MP3 Player - Silver - New/Retail
Qty:  1
Cost: 236.99

-----------------------------------------------------------

Subtotal:      236.99
Shipping:      5.03
Sales Tax:     -
               ------------
Order Total:   242.02
               ------------


Deliver by:    Ground Service


To see the latest information about your order please visit:
http://www.ebuyer.com/sw.html?i&id=297503_100_US

You can also track your order once it has been dispatched by clicking
the the link below:
http://www.ebuyer.com/customer/help/index.html?option=Cmd3RyYWNrX2xyZGVyY_100_US

Thanks again for ordering from Ebuyer.com !


Pricing and availability are subject to change. Ebuyer is not
responsible for any typographical
errors and we reserve the right to cancel any order
where errors are involved. We apologize in advance for any distruption
this may cause and we
appreciate your business !!
--------------------------------------------------------
Thank you for shopping at EBUYER,

Ebuyer Customer Service
EBUYER (US) Inc
Make the right decision
http://www.ebuyer.com

SOMERS000016

http://us.f322.mail.yahoo.com/ym/Sh...

SOMERS000017

# Exhibit 4



# iPod mini

## A thousand songs. Five cool colors.

**Everything you love about iPod just got tinier. iPod mini — available on Mac and Windows for just $249 — lets you bring along enough music for a three-day weekend getaway in a package so small you'll forget you're carrying it. Until people ask you about it.**



### Fashionably Compact

Apple engineers squeezed all the best features of iPod into a case weighing just 3.6 ounces and smaller than most cell phones(1). iPod mini features an anodized aluminium case that resists stains and scratches. The case weighs practically nothing, but protects iPod mini in your pocket, purse or backpack. Recessed in the case to keep its surface pristine wherever you lay it, the 1.67 inch (diagonal) backlit screen displays full song names and more. iPod mini lasts up to 8 hours on a single battery charge(2) and like its (slightly) bigger brothers, iPod mini gives you up to 25 minutes of skip protection.

### Now It Helps to Be All Thumbs

In fact, all the features of iPod are still under your thumb. Always striving for perfection, Apple engineers moved the iPod's buttons under the wheel. The iPod mini Click Wheel gives you the enhanced durability and sensitivity of the iPod Touch Wheel, with buttons underneath. The Click Wheel takes best advantage of miniscule space and lets you scroll single-handedly through 1,000 songs from your iTunes music collection. You'll find such thoughtful construction only from Apple. Because, try as they might, the competition can't touch this.



Oh, one other minor detail, you can choose your iPod mini in one of five trend-setting colors: silver, gold, green, pink or blue, all shiny.



### The iTunes Music Store

Build a collection of music on your iPod mini with songs downloaded from the iTunes Music Store. Choose from more than one million songs and more than 8,000 audiobooks, any of which you can preview and buy with just one click. The iTunes Music Store stays open 24/7 — right on your Mac or Windows PC. Within a minute of finding a song you like, you can own it. You can make unlimited playlists, burn individual songs to CD as many times as you'd like, and take all your music with you wherever you and your iPod mini rove.

---

### Buy an iPod mini

**Buy Now** — Order an iPod mini of your choice online at the Apple Store, open 24 hours a day.

Instant gratification available at an Apple retail store or an iPod reseller near you.

| City, State or Zip | 🔍 |
|---|---|

---

### iPod mini Features

- Keep up to 1,000 songs in your pocket
- Use iPod mini with Mac OS X or Windows 2000/XP
- Take it everywhere — it's only 3.6 ounces
- Find songs fast with the Apple Click Wheel
- Enjoy up to 8 hours of battery life (2)
- Play MP3, AAC and Apple Lossless
- Jog without fear — 25 minutes of skip protection
- Enjoy seamless integration with iTunes
- Sync and charge via included FireWire or USB 2.0 cables
- Use as a portable hard drive — take your files with you
- Remind yourself with Text Notes
- Play games on-the-go
- Stay organized with contacts/calendars/to-do lists
- Choose from hundreds of cool accessories designed just for iPod mini

*more features...*

---

### iPod Updater adds New Features

iPod Updater 2004-11-15 installs

---

1

Case 5:07-cv-05634-LHK   Document 227-3   Filed 04/20/09   Page 44 of 60

## Autosync your iPod mini with Mac and Windows

With iTunes 4.7.1 you can easily organize your music on your Mac or Windows PC and automatically transfer it to iPod mini. Whether you've imported your CD collection in MP3 format, bought music from the iTunes Music Store or created your own original compositions with GarageBand, you can take it all with you. Your iPod mini includes both a FireWire and a USB 2.0 cable for high-speed transfer from your Mac or PC. In fact, you can move an entire album from your computer to your iPod mini in seconds flat. With the industry's only true Auto-Sync, your iPod mini is always up to date, mirroring the latest changes you've made in iTunes. And if the collection on your computer is bigger than iPod mini, you can let iTunes automatically choose a selection of songs to fill it up.

## Games, Calendar, Contacts & Notes



Behind the Click Wheel of your iPod mini await even more features. The world's best digital music player lets you listen to your music as you fall asleep, and it'll wake you up with music or an alarm. You can store a copy of your contacts, calendar and to-do lists on your iPod mini. Or keep anything from restaurant reviews to nightlife guides to news articles to exercise routines — right at your fingertips. iPod mini also includes four fun games you can play anywhere, a feature you're sure to appreciate the next time you're standing in line or waiting for someone. You can even play your music as the soundtrack to the games— Music Quiz, Solitaire, Brick and Parachute.

## Books on iPod mini



The iTunes Music Store features more than 8,000 audiobooks. Listen to Madonna narrate "The English Roses" or laugh at Steve Martin. Learn how Bilbo found the ring in J.R.R. Tolkien's "The Hobbit"or let "The Da Vinci Code" by Dan Brown keep you spellbound. The iTunes Music Store spans the spectrum from the "Autobiography of Benjamin Franklin" to Terry Gross's latest episode of "Fresh Air." With audiobooks on your iPod mini, you can while away your commute commercial-free. iPod mini will even place a bookmark where you pause, ready to pick up where you left off.

. Compared volumetrically to cell phones sold in the U.S..
. Rechargeable batteries have a limited number of charge cycles and may eventually need to be replaced. Battery life and number of charge cycles vary by use and settings. See http://web.archive.org/web/20050222010553/http://www.apple.com/batteries/ for more information.

---

iPod mini Software 1.2, adding features to iPod mini that you'll certainly want to take advantage of. What's new? After you update:

- Music and Shuffle Songs appear in the main menu, of iPod mini, letting you play your music library or shuffle songs with just one click
- Create multiple On-the-Go Playlists you can later synch to iTunes
- Change your mind? You can now delete songs from On-the-Go Playlists
- Adjust the reading playback speed for the audiobooks on iPod mini
- Hear that? You can now hear the Click Wheel clicker through your headphones
- Enjoy compatibility with iTunes 4.7 and the iTunes Music Store
- Sync and go with improved disconnect performance

### iPod mini Software Downloads



iTunes 4.7.1 lets you find and delete duplicate songs, search iMixes by title and more.



Get the latest iPod mini software and take advantage of all the great new features in iTunes 4.7.1.

### See More of the iPod mini



QTVR      Gallery

### Learn More about iPod mini

Whether you use a Mac or PC, iPod mini works famously with iTunes. Would you like to see how you can transfer just the music you want to your iPod mini? We show you how — and much more — in the step-by-step iPod tutorials available on the iPod Support Site.

Share your feedback with us and make the iPod mini even better. 

---

Copyright © 2005 Apple Computer, Inc. All rights reserved.

# Exhibit 5

http://www.macmall.com/macmall/families/iPod/ipodtouch.asp



Home | About Us | 🛒 Shopping Cart | Checkout | Order Status | Rebates & Coupons | Login

**MacMall**

*Your #1 Apple Superstore!*
1-800-MACMALL (622-6255)

**April Apple Deals**
On Macs, iPods, Mac & iPod Accessories,
Software, HDTVs & More

Prices Cut up to
**83%**

**New iMac!** Stunning graphics. Beautiful Price.
20" iMac starts at **$1129⁹⁸**\*
24" iMac starts at **$1409⁹⁹**\*
\**After mail-in rebate(s).*

**Mac & iPod Closeout Blowouts!**
While Supplies Last - Save up to 50%
Plus lots of FREE Exclusives with purchase! *after rebate*

Search ❯❯

Business | Brands | Mac Systems | Mac Accessories | Mac Software | Storage | iPod/iPhone Accessories | Electronics/TVs | Gaming

🍎 **Authorized Reseller** MacBook | MacBook Air | MacBook Pro | Mac mini | iMac | Mac Pro | Xserve | iPod shuffle | iPod nano | iPod classic | iPod touch | Apple TV

**No Payments for 90 Days or 6 Months** on orders over $250 or $500!
*Subject to credit approval.* Details >


Win Apple iPod touch 8GB
Weekly Drawing **Enter Now!**


**New Mac mini** – Faster. Greener. Still mini.
From **$574**\* Blowout Specials from **$474**\*

**Now accepting** **PayPal**

🍎 **Authorized Reseller**

Select your iPod: **iPod touch** | iPod classic | iPod nano | iPod shuffle

---

**Featured Item**



**Apple Software**
MobileMe - Single User
~~$74.99~~ **$64.99**

**iPod Accessories**

- iPod Accessories by Apple
- Batteries
- Cables
- Car Adapters
- Car Chargers
- Car Connection Kits
- Car Mounts
- iPod Care Products
- Cases
- Chargers/Power
- Docks
- FM Transmitters
- Headphones - Earbuds
- Headphones - Street/Sport
- Headphones - Studio/Professional
- Headphones - Wired
- Headphones - Wireless
- Media Reader
- Remotes
- Speakers
- USB Controllers
- Voice Recorders


The new
**iPod touch**
Starting at
**$212⁹⁴**
*16GB iPod touch blowout deals only at $264.99!*

Plus,

- Free Engraving
- Free iPod Charger*
- Free Leather Case* or
- Free Silicone Case*

\*FREE IPOD CHARGER - I Rock AC/USB Power Adapter for iPod is free after $9.99 mail-in rebate.
\*FREE LEATHER CASE - MacAlly Bella Protective Leather Case is free after $19.99 mail-in rebate.
\*FREE SILICONE CASE - Incipio Silicone Skin Case is free after $7.99 mail-in rebate.
Offers are valid when purchased on same invoice with iPod touch.

**Model**

   

|  | NEW! 8GB (2nd Gen) | NEW! 16GB (2nd Gen) | NEW! 32GB (2nd Gen) | 16GB (1st Gen) BLOWOUT SPECIAL |
|---|---|---|---|---|
|  | Select | Select | Select | Select |
|  | without Engraving | without Engraving | without Engraving | without Engraving |
|  | **$217.99** | **$283.99** | **$373.99** | **$264.99** |
|  | Select | Select | Select | Select |
|  | with Engraving | with Engraving | with Engraving | with Engraving |
|  | **$212.94** | **$283.99** | **$373.99** | **$264.99** |
| **Estimated Ship** | Stocks. Usually ships 2-3 bln stock. Usually ships the same business day. (Engraved iPods may require additional 1-2 days for shipping)usiness days. (Engraved iPods may require additional 1-2 days for shipping) | In stock. Usually ships the same business day. (Engraved iPods may require additional 1-2 days for shipping) | In stock. Usually ships the same business day. (Engraved iPods may require additional 1-2 days for shipping) | In stock. Usually ships the same business day. (Engraved iPods may require additional 1-2 days for shipping) |
| **Storage** | 8GB (1,750 songs) | 16GB (3,500 songs) | 32GB (7,000 songs) | 16GB (3,500 songs) |
| **Battery Life** | Up to 36 hours of music playback; up to 6 hours of video playback | | | |
| **Wireless Data** | Wi-Fi 802.11b/g, Nike + iPod support built-in, Maps location-based service | | | Wi-Fi 802.11b/g |
| **Size** | 4.3 x 2.4 x 0.33 inches | | | 4.3 x 2.4 x 0.31 inches |
| **Weight** | 4.05 ounces | | | 4.2 ounces |

---

**Information Center**

**iPod touch**

**The funnest iPod ever.**

iPod touch has always been an amazing iPod. And with its groundbreaking technologies and access to hundreds of games, iPod touch puts an amazing gaming experience in the palm of your hand. It comes in 8GB, 16GB, and 32GB models with new volume controls and a built-in speaker. Play hours of music. Create a Genius playlist of songs that go great together. Watch a movie. Surf the web. View rich HTML email. Find your location and get directions with Google Maps. And shop the App Store for games and applications.

Bookmark To: 

| Resources | Contact Us | Customer Support | Company Information |
|---|---|---|---|

My Account
CAP Account Login
MacMall Preferred Account
Special Events
Shopper's Assistant
Digital Imaging Configurator
Battery Configurator
Small Business Center
Software Licensing
Memory Configurator
Supplies and Accessories
RSS Feeds

Business Solutions
Catalog & Advantage email
Contact Us
Feedback
Join Our Affiliate Network

Customer Service
Tech Support
Manufacturer Warranty
Site Map
Unsubscribe from email

Employment
Retail Store Locations
Privacy Policy
Investor Relations
About Us
General Terms and
Disclaimers

2555 West 190th Street - Torrance, CA 90504 - 800.MACMALL
© 2009 MacMall





# Exhibit 6



- Order status · Your account · Wish list
- Store locator · On sale · Research library
- Weekly Ad · Outlet store · Rebate center

NEED HELP DECIDING?
GIVE US A CALL
800.843.7422
24/7 Hablamos Español

Home  Trade-In Program  Shopping Tools

Search ▶ [ ] in [Entire site ▾] Go

PHONES & RADIO COMMUNICATIONS | PORTABLE MUSIC | CAMERAS & CAMCORDERS | POWER & BATTERIES | HOME ENTERTAINMENT | CABLES, PARTS & CONNECTORS | GPS & CAR | HOME OFFICE | COMPUTERS | TOYS & GAMES

You're shopping in ▸ Home ▸ Portable Music ▸ **MP3 players & iPods**

In store only

**Apple® 8GB iPod® touch**

☐ Print   ✉ Email a friend

**$229.99**

Model: MB528LL/A
Catalog #: 42-471

Online: Not available
Available at most stores, find it near you

Product summary | Features | Tech specs | Accessories | Customers rate it

See more images   ▸ More photos (4)

· **Free Ground Shipping for any order over $10 - except Desktops, Laptops & Televisions.** · More details

**Music just got smarter.**
The new Genius feature turns the redesigned iPod touch into a highly intelligent, personal DJ. With a few taps, it creates a playlist by finding songs in your library that go great together. With a stunningly thin, contoured stainless steel design, iPod touch feels even better in your hand. And the new volume buttons and built-in speaker give you more to love.

- 8GB of storage holds up to 1,750 songs, 10,000 photos or up to 10 hours of video[1]
- 3.5" (diagonal) widescreen multitouch display delivers an interactive experience with bright images
- Genius feature finds the songs in your library that go great together and makes unique playlists
- A built-in speaker lets you hear the music, dialogue, and action without headphones
- Wi-Fi web browsing using the built-in Safari browser so you can stay connected anywhere you go[2]
- Accelerometer detects when you rotate iPod touch from portrait to landscape to adjust the display
- Improved battery life provides up to 36 hours[3] of audio playback or 6 hours of video playback

**What's in the box**

- iPod touch
- Earphones
- USB 2.0 cable
- Dock adapter
- Polishing cloth
- Quick Start guide

**Other ways to get it**

In store:
▸ Available at most stores, find it near you

**Customer reviews**
Showing most recent reviews
The ipod touch(also known as the funnest ipod ever!) has outsanding graphics! Whenever im bored i... busy soccer mom - 3/23/2009

The ipod touch is Great!! Once again Apple topped the charts this device is amazing its like the... LBking - 3/16/2009

**Pricing and availability:** Please note that all prices are subject to change without prior notice. Prices advertised on this site are for online orders only. Prices on some items may differ from those advertised in RadioShack stores. All merchandise may not be available at all stores, and all stores may not participate in all sales promotions. We recommend you contact the store to confirm product availability and pricing.

**Disclaimer:** [1]Based on songs in 128Kbps AAC format, photo capacity is based on iPod-viewable photos transferred from iTunes and video capacity based on H.264 1.5Mbps video at 640x480 resolution combined with 128Kbps audio; actual capacity varies by content.
[2]Internet access required; broadband recommended; fees may apply
[3]Rechargeable batteries have a limited number of charge cycles and may eventually need to be replaced. Battery life and number of charge cycles vary by use and settings.

**Product Rating**
                           (51 Ratings)
Write a Review
Read 51 Reviews

Read the owner's manual
See technical specifications
See Features of this product

**BATTERY FINDER**

POWER YOUR Barcode Scanners

Search by device or battery #:
[device or battery #] Go

**$2 Ground Shipping on all Batteries**

Click here to find your battery using our interactive tool

**Featured Promotions**

**Crosley Radio CR-85 Collegiate Record Changer (Oak)**
**$159.99**
You save: -$20.00
Offer ends 4/15


**Sanyo Easy Street™ NVM-4370 GPS Receiver**
**$94.99**
You save: -$155.00
Limited time offer

See all of our GPS deals

**LG Incite™ CT810**
**FREE**
with a qualifying new 2-year AT&T agreement. Web only price.


**Gigaware® Stereo Headphone to USB Adapter with Microphone**
**$9.99**
You save: -$10.00
Offer ends 4/15

**AcomData™ pureDrive 1TB USB eSATA External Hard Drive**
**$119.99**
You save: -$20.00
Offer ends 4/15

Click here for more great deals
**Subscribe for great deals:**
Click here and subscribe for instant updates via email or RSS!

**Stuff you may want**

Apple® Component A/V Cable
**$49.99**

Apple® Composite A/V Cable
**$49.99**

Nike + iPod® nano Sport Kit
**$29.99**



Gigaware™ Sync Cable
for iPod®

**$19.99**

Accurian® FM
Transmitter for iPod®

**$39.99**

▸ See all needs and wants

**Need to back up a bit?** Try looking in MP3 players & iPods.

■ **Get special offers by email** [          ]  [Go]  Sign up for our email newsletter, and get special offers, product news, and more.

| Before you order | Where's your order? | Returns and refunds | Need assistance? |
|---|---|---|---|
| · See our **privacy policy**.<br>· View our shipping policy. | · Sign in to see your order history.<br>· Visit your account to change your personal information. | · Learn how to return an item.<br>· Check our refund policy. | · Contact us anytime.<br>· Forgot your password?<br>· See our site map.<br>· Hablamos español: 1-800-843-7422. |

### Important information about Analog to Digital TV conversion - click here

About us : **Careers** : Investor information : Franchise opportunities : Become an affiliate : **Privacy policy** : Terms and conditions
Credit card services : Commercial sales : Product safety recalls : Employee Information : Product Reviews : Accessibility Statement

**Visit Special Offers, Savings Alerts and more, or Subscribe via RSS for up-to-the minute alerts.** 🔲

Online prices and product selection may vary from our retail stores. All prices and offers are subject to change.

Copyright © RadioShack Corporation 2009. All rights reserved.