IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Stacie Somers, | NO. C 07-06507 JW |
| Plaintiff, | **ORDER DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| v. | |
| Apple, Inc., | |
| Defendant. | |

## I. INTRODUCTION

Stacie Somers ("Plaintiff") brings this putative class action against Apple Computer, Inc. ("Defendant"), alleging violations of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, and related state law claims. Plaintiff alleges that Defendant has committed unlawful acts in the sale of its iPod portable digital music player and online digital music files sold through its iTunes Music Store ("iTMS"), in violation of federal and state antitrust laws.

Presently before the Court is Plaintiff's Motion for Class Certification and Appointment of Co-Lead Class Counsel. (hereafter, "Motion," Docket Item No. 39.) The Court conducted an evidentiary hearing on June 30, 2009. Based on the papers submitted to date and oral argument, the Court DENIES in part Plaintiff's Motion for Class Certification and Appointment of Co-Lead Class Counsel.

## II. BACKGROUND

**A.    Factual Allegations**

In a Complaint filed on December 31, 2007, Plaintiff alleges as follows:

Plaintiff purchased a 30 GB iPod from Target.[1]  In December 2005 and periodically thereafter, she purchased music from iTMS, downloaded the music to her personal computer, and uploaded the music from her personal computer to her iPod.  (Id. ¶ 19.)

Apple owns and operates iTMS, an Internet site that offers digital music and video computer files for online purchase and download.  (Complaint ¶ 2.)  iTMS is accessed with proprietary Apple software rather than an Internet browser.  Id.  Apple designs the hardware and software of its iPod digital music player ("iPod").  (Id.)

The "Online Music Market" is the market for digital music delivered to the consumer by way of Internet download ("Online Music").  (Complaint ¶ 3.)  Apple's share of the Online Music Market is 83 percent.  (Id. ¶ 5.)  The "Online Video Market" is the market for digital video files that are purchased and downloaded via the Internet that can be viewed both on a home computer and a video-enabled Digital Music Player ("Online Video").  (Id. ¶ 6.)  Apple's share of the Online Video Market is at least 75 percent.  (Id. ¶ 7.)  The "Digital Music Player Market" is the market for portable battery-powered devices that can store and play large numbers of digital music computer files.  (Id. ¶ 8.)  This latter market is comprised of two major types of digital music players, those that store music files on miniature hard drives and those that store music using flash memory.  (Id. ¶ 9.)  Apple has more than 90 percent market share for the hard drive-based player market, and a 70 percent market share of the flash memory-based market.  (Id.)  All three markets described above refer to the United States only.  (Id. ¶ 11.)

---

[1] (Complaint for Violations of Sherman Antitrust Act, Cartwright Act, California Unfair Competition Law, Consumer Legal Remedies Act, and Monopolization of Business Practices ¶ 18, hereafter, "Complaint," Docket Item No. 1.)

2

Apple deliberately makes digital music purchased at iTMS inoperable with its competitors' digital music players. (Complaint ¶ 14.) In order to play music from iTMS on a digital music player, then, a consumer's only option is the iPod. (Id.) Apple sells the iPod at prices far exceeding those that would prevail in a competitive marketplace. Id. Apple also makes the iPod unable to play music sold at its competitors' online music stores. (Complaint ¶ 15.) In order to purchase Online Music to play on an iPod, then, a consumer's only option is iTMS. (Id.)

Improved hard drive and video compression technology has recently made feasible playback of video content (e.g. television shows) on Digital Music Players. (Complaint ¶ 16.) Apple uses the same tactics described above to block consumers from purchasing and playing its competitors' Online Video on iPods. (Id.)

Apple makes music files purchased on iTMS incapable of being played by other digital music players. (Complaint ¶ 41.) Consumers who have purchased Online Music from Apple to play on their home computers must buy an iPod if they want to play their music on a digital music player. (Id.) Consumers who first purchase an iPod cannot purchase Online Music for play on iPod from any company besides Apple. (Id. ¶ 42.)

Apple has been able to charge iPod purchasers a supracompetitive price by preventing consumers who have purchased music files from iTMS from playing their music on Apple's competitors' digital media players. (Complaint ¶ 54.) By preventing iPod owners from buying music from Online Music retailers other than iTMS, Apple "deters consumers from even considering doing business with its competitors' music and video stores, allowing it to monopolize these markets." (Id. ¶ 55.)

On the basis of the allegations outlined above, Plaintiff alleges seven causes of action: (1) Unlawful tying in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) Unlawful acquisition or maintenance of monopoly power in the digital music player market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) Attempted monopolization of the online music and video

markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16270, *et seq.*; (5) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (6) Violation of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; and (7) Common law monopolization of business practices.

**B.    Procedural History**

This action is one of two related cases, both of which make the same substantive allegations and assert the same causes of action against Defendant Apple. The other action, The Apple iPod iTunes Antitrust Litigation, No. C 05-00037 JW ("Direct Purchaser Action"), differs from this action in that Plaintiffs in that case purchased iPods from Defendant directly. In contrast, this action is the parallel Indirect Purchaser Action, asserted by Plaintiff on behalf of all persons or entities who "purchased an Apple iPod indirectly from Apple." (Motion at 3.) Plaintiff Somers alleges that she purchased an iPod from third-party vendor Target. (Complaint ¶ 18.)

Although there have been no dispositive motions filed to date in this Indirect Purchaser Action, there is a lengthy procedural history associated with the related Direct Purchaser Action. The Court reviews the recent procedural history in that case, as it is relevant to the present Motion for Class Certification. In particular, on December 22, 2008, the Court issued an Order granting in part the Direct Purchaser Plaintiffs' motion for class certification. (hereafter, "December 22 Order," Docket Item No. 196 in Case No. C 05-00037 JW.) The Court certified classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), based on the Direct Purchaser Plaintiffs' Sherman Act § 2 and state law claims. The Court, however, declined to certify a class as to either the Sherman Act § 1 tying claims or the tying component of the companion state law claims. Instead, the Court ordered supplemental briefing on issues surrounding whether the Direct Purchaser Plaintiffs' tying claim is, as a matter of law, cognizable under established Section 1 jurisprudence. Defendant subsequently filed a motion for judgment on the pleadings as to the tying claims.

On May 15, 2009, the Court issued an Order granting Defendant's motion for judgment on the pleadings. (hereafter, "May 15 Order," Docket Item No. 213 in Case No. C 05-00037 JW.) The

4

1  Court found that the Direct Purchaser Plaintiffs failed to state a cognizable tying claim, because, as a
2  matter of law, there can be no per se tying liability where the tying and tied products are separately
3  available, and where the only allegation is that there is a technological interrelationship between the
4  two products that may induce purchasers of one to purchase the other.

5  Presently before the Court is Plaintiff's Motion for Class Certification in this parallel Indirect
6  Purchaser Action.

### III.  STANDARDS

The decision to certify a class is committed to the discretion of the district court within the guidelines of Federal Rule of Civil Procedure 23.  See Fed. R. Civ. P. 23; Doninger v. Pacific Northwest Bell, Inc., 564 F.3d 1304, 1309 (9th Cir. 1977).  The party seeking class certification bears the burden of establishing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met.  Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007) (citing Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), amended, 273 F.3d 1266 (9th Cir. 2001)).  A district court may certify a class only if, after "rigorous analysis," it determines that the party seeking certification has met its burden.  General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 158-61 (1982).

In reviewing a motion for class certification, the court generally is bound to take the substantive allegations of the complaint as true.  In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982) (citing Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).  However, the court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met.  Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) (citation omitted).  In fact, "courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case."  Dukes, 509 F.3d at 1178 n.2 (internal quotations and citation omitted).

## IV. DISCUSSION

Plaintiff seeks to simultaneously certify an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3). (Motion at 6-8.) Specifically, Plaintiff seeks to certify a class with the following definition:

> All persons and entities in the United States (excluding federal, state and local governmental entities, Apple, its directors, officers and members of their families) that from December 31, 2003 to the present ("Class Period") purchased an Apple iPod indirectly from Apple for their own use and not for resale.

(Motion at 3.)

Defendant contends that Plaintiff fails to advance class-wide methods of demonstrating individual coercion[2] or damages, which Defendant asserts are critical for class adjudication of indirect purchaser claims. (Defendant's Opposition to Motion for Class Certification at 8-9, hereafter, "Opposition," Docket Item No. 52.) Defendant also contends that a nationwide class is not appropriate, because California antitrust law should not be applied on a nationwide basis. (Id. at 19.)

**A.  Rule 23(b)**

Plaintiff moves for hybrid certification of a Rule 23(b)(2) class on the issue of injunctive and declaratory relief, and a Rule 23(b)(3) class on the issue of monetary relief. (Motion at 9-11.)

In addition to meeting the requirements under Rule 23(a), class action plaintiffs must also establish that one or more of the grounds for maintaining the suit as a class action are met under Rule 23(b): (1) there is a risk of substantial prejudice from separate actions; (2) declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) common questions of law or fact predominate and the class action is superior to other available methods of adjudication.

---

[2] In light of the Court's determination in the Direct Purchaser Action that, as a matter of law, the Direct Purchaser Plaintiffs' tying claims could not proceed, the Court declines to certify any class on the basis of Plaintiff's tying claims in this Indirect Purchaser Action. Indeed, the tying claims in the two actions are based on substantively identical allegations surrounding Defendant's alleged creation of a coercive technological interrelationship between iPods and iTMS products. Accordingly, the Court need not consider issues surrounding methods of proving coercion on a class-wide basis.

Fed. R. Civ. P. 23(b). In class actions certified under Rule 23(b)(1) or (b)(2), class members do not have mandatory rights to exclude themselves from the judgment by opting out of the class. See Molski v. Gleich, 318 F.3d 937, 947 (9th Cir. 2003). Such mandatory opt out rights automatically attach to Rule 23(b)(3) classes only. Id.; Fed. R. Civ. P. 23(c)(2)(B).

In light of the unique circumstances presented by indirect purchaser antitrust class actions, the Court first establishes the legal framework for addressing certification of such cases. The Court then evaluates whether certification is appropriate in this case under Rule 23(b)(2) or Rule 23(b)(3).

**B.     Indirect Purchaser Antitrust Class Actions**

Indirect purchasers may not recover for violations of federal antitrust law. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). In Illinois Brick, the Supreme Court reasoned "that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." Id. at 735. Nonetheless, "a number of states, including California, have since enacted statutes repealing the Illinois Brick rule for private actions under *state* antitrust laws." In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 499 (N.D. Cal. 2008) (emphasis in original).

Recovery in an indirect purchaser case under state law requires a demonstration that a defendant "overcharged [its] direct purchasers for [the product at issue] and that those direct purchasers passed on the overcharges to [the] plaintiffs." Id. As a consequence, "the problem of proof in an indirect purchaser case is intrinsically more complex, because the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge." Id. (quoting William H. Page, The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick, 67 Antitrust L.J. 4, 12 (1999-2000)). Courts have declined to certify indirect purchaser class actions where the plaintiff failed to establish "a reliable method for proving

7

common impact on all purchasers of [the] defendant's products throughout the chain of distribution." Id. at 507.[3]

For example, in Graphics Processing, Judge Alsup declined to certify an indirect purchaser Rule 23(b)(3) damages class where the plaintiffs established no common formula for proving impact on direct purchasers and presented to the court a "fatally flawed" method of demonstrating common impact on the indirect purchasers.[4] Id. Judge Alsup reasoned that "[t]he record shows that the only way to fully assess pass-through [of anticompetitive impact from direct to indirect purchasers] . . . would be to conduct a wholesaler-by-wholesaler and re-seller-by-re-seller investigation, which would essentially result in 'thousands of mini-trials, rendering [the] case unmanageable and unsuitable for class action treatment.'" Id. at 505 (quoting McCarter v. Abbott Labs., Inc., No. Civ. A. 91-050, 1993 WL 13011463, at *5 (Ala. Cir. Ct. Apr. 9, 1993)).

**C.     Certification Under Rule 23(b)(3)**

Plaintiff contends that she has met the requirements for certification under Rule 23(b)(3). (Motion at 8.) Of particular relevance, Plaintiff contends that her expert's methodology is sufficient to establish damages on a class-wide basis. (Id. at 17-18.) Defendant responds that Plaintiff's expert's methodology is impermissible and unproven, and thus cannot act as the basis for certification under Rule 23(b)(3). (Opposition at 11-14.)

---

[3] See also In re Methionine Antitrust Litig., 204 F.R.D. 161, 164 (N.D. Cal. 2002) ("to prove that each class member was actually injured by the [anticompetitive conduct, the] plaintiff must prove that the 'overcharge' was passed on to each [class] member and that the member absorbed the overcharge or was otherwise harmed by having to pay a higher price. . . ."); In re Brand Name Prescription Drugs Antitrust Litig., Nos. 94 C 897, MDL 997, 1994 WL 663590, at *7 (N.D. Ill. Nov. 18, 1994) (denying certification of indirect purchaser claims, based on the rationale that "tracing the alleged overcharges from manufacturers, to wholesalers, to retailers, to consumers presents individualized issues which would dominate this litigation and preclude certification under rule 23(b)(3).")

[4] Judge Alsup also declined to certify an indirect purchaser class under Rule 23(b)(2), on the ground that the plaintiffs primarily sought money damages. As an additional rationale for denial of the 23(b)(2) class, Judge Alsup certified the antitrust claims of a parallel direct purchaser class, and found that the direct purchaser class' claims were adequate to "cure any ongoing harm." Graphics Processing, 253 F.R.D. at 508.

8

Certification under Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon, 150 F.3d at 1022. In order to determine whether a class action is superior to individual action, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." Hunt v. Check Recovery Systems, Inc., 241 F.R.D. 505, 514 (N.D. Cal. 2007) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)).

In this case, Plaintiff offers the affidavit of her expert, Dr. Gary French, Ph.D.[5] According to the Dr. French's Affidavit, the approach Plaintiff proposes to calculate damages incurred by indirect purchasers

> is to estimate Apple's overcharge to direct purchasers for iPods and then estimate the proportion of that overcharge passed-through to indirect purchasers. An alternative is to determine damages to indirect purchasers directly, at the retail level. The latter approach requires data on retail sales and prices of iPods during the Class Period and outside the Class Period.

(Id. ¶ 64.) Dr. French goes on to state that there are three possible methods to determine the direct purchaser overcharge: "reliance on a temporal or 'yardstick' competitive benchmark or margin analysis." (Id. ¶ 65.) In general, these proposed methods operate as follows:

> Temporal benchmarks include comparing prices "before-during," "during-after," or "before-during-after" periods. The yardstick approach may compare iPod pricing in the United States with the pricing of another product (such as other MP3 players) or another geographic market in which no tie is alleged to have existed. Margin analysis is another possible approach, whereby the analyst evaluates the price-cost margins for iPods over time.

---

[5] (Declaration of Arleen Haeggquist in Support of Plaintiff's Motion for Class Certification and Appointment of Class Counsel, Ex. 1, hereafter "Haeggquist Decl.," Docket Item No. 45.)

1 (Id.) Finally, Dr. French provides for an alternative "more direct approach," in which damages
2 would be measured by performing "regression analysis using retail iPod prices. Such regression
3 analysis would attempt to explain variation in retail iPod prices due to the presence (or absence) of
4 the alleged misconduct using an indicator variable." (Id. ¶ 69.) In order to perform these various
5 damage analyses, Dr. French claims that he would require "(1) Apple iPod direct purchaser
6 transaction data beginning in October 2001 until the present and (2) retail data for Apple iPods. . . ."
7 (Id. ¶ 70.)

8 Defendant contends that Dr. French's approach fails to demonstrate how all class members
9 suffered injury as a consequence of Defendant's alleged anticompetitive activity. (Opposition at
10 12.) Defendant asserts that the proposed method, which would involve aggregation of data in an
11 attempt to calculate an average overcharge applied across all purchasers, is flawed because it would
12 be performed "without regard to the actual priced [purchasers] paid and whether they included any
13 overcharge." (Id.) Furthermore, Defendant contends that Plaintiff offers no proof that Dr. French's
14 damages methodologies will work in this case or that Dr. French has any basis for dealing with
15 prices charged by iPod resellers to indirect purchasers. (Id. at 15.)

16 In response to this dispute over Plaintiff's expert's proposed methodologies, the Court held
17 an evidentiary hearing and permitted Defendant to offer expert testimony. In advance of the hearing,
18 Defendant submitted the expert report of Dr. Michelle Burtis, Ph.D., an economist. (hereafter,
19 "Burtis Report," Docket Item No. 74.) In her report, Dr. Burtis testifies that "Dr. French . . . has not
20 developed any actual model or provided sufficient information about his proposed models to
21 demonstrate or even suggest that they would work. He has collected little if any data. He has not
22 identified or quantified any specific variables. He has no written equations." (Id. ¶ 8.) Dr. Burtis
23 goes on to criticize Dr. French's proposed use of a regression model to evaluate pricing for a host of
24 evolving iPod models that emerged during the proposed class period. She criticizes Dr. French's
25 purported inability to distinguish between the periods before and after the alleged anticompetitive
26 conduct occurred, or to distinguish the effects of the alleged anticompetitive conduct from the

effects of other legitimate business decisions made by Defendant. (Id. ¶¶ 8-9.) Dr. Burtis also criticizes Dr. French's inability to deal with whether any iPod overcharge may have been offset by lower iTMS pricing, as well as Dr. French's use of average pricing as a method of determining overcharge to individual consumers. (Id. ¶¶ 11-12.) Dr. Burtis' general conclusions are then supported by an extensive explanation of how the types of regression models proposed by Dr. French cannot be reliably applied to the complex product and pricing dynamic underlying the claims in this case.

The June 30 evidentiary hearing bore out the dispute that was framed by the parties' competing expert reports. Dr. French testified generally about his history of using regression models, and further testified that he could create a model that was sufficient to calculate individual damages on a class-wide basis. On cross-examination, however, Dr. French conceded that he had never successfully employed a regression model to an indirect purchaser antitrust class action. He also conceded that he has not yet developed a model or worked with any data in the context of this case.

In contrast, Dr. Burtis gave specific testimony about how regression models work, and testified about the difficulties of constructing such a model to deal with the complex multi-variable situation underlying iPod pricing. Dr. Burtis contrasted the situation in this case with a successful regression model she constructed to deal with crude oil prices in the aftermath of Hurricane Katrina. The point of this testimony was to illustrate how a regression model may be successful where there is abundant data on pricing in the period prior to a clear price-altering event. Dr. Burtis testified that, in the present case, there is limited data on iPod pricing before the alleged anticompetitive conduct occurred. In addition, she testified that there was no clear point at which the effects of anticompetitive conduct would be felt in iPod pricing. According to Dr. Burtis, this latter uncertainty is exacerbated by the numerous factors that would have affected iPod pricing, as well as by the continual introduction of new and cheaper iPod models throughout the proposed class period.

1  Ultimately, her testimony was that Dr. French had failed to propose a model that could adequately
2  account for the morass of variables that make up the iPod pricing dynamic.

3  As the Court stated at the hearing, the parties' testimony merely served to highlight the
4  Court's reservations about the adequacy of Plaintiff's proposed method of determining class
5  damages. The Court finds it significant that Plaintiff has done nothing more than make a vague five-
6  paragraph long collection of proposals for accomplishing what the Court sees as a daunting task.
7  The Court also finds the overall testimony of Dr. Burtis far more persuasive than that of Dr. French.
8  Dr. French's testimony was limited to making unspecified proposals as to how he might be able to
9  prove damages, while Dr. Burtis's testimony showed the significant challenges that Dr. French
10 would face in carrying out his proposals. Dr. French has proffered no specific economic model and
11 has examined no set of data, and has never accomplished what he purports to accomplish in an
12 indirect purchaser antitrust class action. Furthermore, the Court discerned nothing from Dr.
13 French's testimony as to how his method would address the problem of overcharge pass-through
14 from iPod resellers to members of the putative class. That is, testimony at the evidentiary hearing
15 focused on whether Plaintiff could even demonstrate supracompetitive pricing for iPods, and did not
16 even reach the critical inquiry relating to proving whether such overcharges were, in fact, passed on
17 to individual consumers.

18 In sum, the Court finds that Plaintiff has failed to meet her burden of establishing "a reliable
19 method for proving common impact on all purchasers of [D]efendant's products throughout the
20 chain of distribution." Graphics Processing, 253 F.R.D. at 507. Accordingly, the Court DENIES
21 Plaintiff's Motion for Class Certification of a class under Rule 23(b)(3).

22 **D.**     **Certification Under Rule 23(b)(2)**

23 Plaintiff also moves for certification of an injunctive relief class under Rule 23(b)(2).
24 Plaintiff contends that an "injunction would force Apple to stop charging consumers for removal of
25 DRM from iTunes downloads, which would remove the lock-in that DRM represents." (Motion at
26 7.) The Court, however, declines to certify a Rule 23(b)(2) class at this time. As discussed in the

28                                                   12

Court's July 17, 2009 Order directing the parties to submit further briefing, the Court will not rule on this issue until it has greater understanding of the claims, the class definition, and the form of injunctive relief sought by Plaintiff in this case and the Plaintiffs in the parallel Direct Purchaser Action.

Accordingly, the issue of Rule 23(b)(2) certification remains under submission until such time as the Court rules on the parties' responses to the July 17 Order.

### V. CONCLUSION

The Court DENIES in part Plaintiff's Motion for Class Certification under Rule 23(b)(3). The Court defers ruling on class certification under Rule 23(b)(2) pending further briefing as directed in a separate Order.

Dated: July 17, 2009

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alreen Haeggquist alreenh@zhlaw.com
Craig L. Briskin cbriskin@findjustice.com
Elaine Wallace ewallace@jonesday.com
Helen I. Zeldes helenz@zhlaw.com
Michael Tedder Scott michaelscott@jonesday.com
Robert Allan Mittelstaedt ramittelstaedt@jonesday.com
Tracy Strong tstrong@jonesday.com

**Dated: July 17, 2009**　　　　　　　　　　**Richard W. Wieking, Clerk**

　　　　　　　　　　　　　　　　　　　　　**By: /s/ JW Chambers**
　　　　　　　　　　　　　　　　　　　　　　　**Elizabeth Garcia**
　　　　　　　　　　　　　　　　　　　　　　　**Courtroom Deputy**